*26*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.

D-1 WILLIAM S. GONTE,
D-2 BRIAN W. BENDEROFF,

          Defendants.

Case:2:20-cr-20380
Judge: Edmunds, Nancy G.
MJ: Grand, David R.
Filed: 08-26-2020 At 03:45 PM
INDI USA V. GONTE ET AL (DA)

Violations:
18 U.S.C. § 1349
18 U.S.C. § 1343
18 U.S.C. § 2

## **INDICTMENT**

THE GRAND JURY CHARGES THAT:

## **GENERAL ALLEGATIONS**

At times relevant to this Indictment:

### Life Insurance and Life Settlement Transactions

1. Life insurance policies are contractual arrangements that provide for the payment of a sum of money, known as a death benefit, upon the death of a designated individual, known as the insured.

2. Life insurance policies are maintained through the payment of premiums, typically on a regular basis.

3. If the owner of a life insurance policy does not make sufficient premium payments, the policy may "lapse" and will no longer pay a death benefit.

4. An owner of a life insurance policy can sell the policy to a third-party purchaser in a transaction known as a "life settlement."

5.  In a life settlement transaction, the purchaser typically makes a lump-sum payment to the seller of the policy.  In exchange, the purchaser, who assumes responsibility for future premium payments, becomes the beneficiary of the policy's death benefit.

6.  The value of a life insurance policy in a life settlement transaction is heavily influenced by the insured's life expectancy.  Because the purchaser of a life insurance policy has a continuing obligation to make premium payments on the policy and will not receive a return on investment until the insured's death, a policy is more valuable if the insured has a short, rather than long, life expectancy.  Consequently, when all is else is equal, policies for insureds with short life expectancies typically sell for higher prices than policies for insureds with longer life expectancies.

<u>Life Expectancy Reports</u>

7.  As part of the marketing of a life settlement transaction, sellers, or brokers acting on their behalf, commonly obtain life expectancy reports.  These reports are actuarial assessments by third-party companies, known as life expectancy providers, that make projections regarding an insured's life expectancy.

8.  Life expectancy reports are generated, in part, by a life expectancy provider's analysis of an insured's health and medical history.

9.  A life expectancy provider conducts the analysis of an insured's health and medical history by, in part, reviewing medical records submitted by the seller

or on the seller's behalf.   Those medical records typically include records from past physician visits by the insured, as well as medical examinations and tests conducted on the insured.

## Life Settlement Valuation

10. When marketing a life settlement transaction, a seller, or broker acting on the seller's behalf, will commonly submit policy records, as well as life expectancy reports, to a potential purchaser.

11. Upon review of the policy records and life expectancy reports, a potential purchaser may decide to offer a bid on a given life insurance policy for a set price.  The potential purchaser may also decline to offer a bid on the policy.

## Closing Process

12. If the seller of a life insurance policy accepts a potential purchaser's bid, the potential purchaser will typically collect additional documentation and information regarding the policy before ultimately closing the transaction and transferring funds to the seller and any broker acting on his or her behalf in the transaction.

## The Defendants and Relevant Individuals

13. Defendant WILLIAM S. GONTE ("GONTE") was a resident of the Eastern District of Michigan and a physician.

14. Defendant BRIAN W. BENDEROFF ("BENDEROFF) was a resident of the Eastern District of Michigan and facilitated life settlement transactions on behalf of third parties though his association with Broker A

15. Broker A was a resident of the Eastern District of Michigan and a broker of life settlement transactions.

16. Owner A was a resident of the Eastern District of Michigan and a local business executive.

<u>Relevant Entity</u>

17. Wells Fargo, Bank, N.A. was a "financial institution" as defined by 18 U.S.C. § 20.

<u>The Policies</u>

18. As of approximately 2008, OWNER A owned multiple insurance policies in which his mother ("OWNER A's MOTHER") was the insured (the "Policies"). The Policies carried a cumulative death benefit of approximately $63 million:

| Insurance Company | Policy Number | Death Benefit |
|---|---|---|
| Lincoln Benefit | 3691 | $10 million |
| Lincoln Benefit | 3495 | $10 million |
| Lincoln Benefit | 0268 | $5 million |
| AIG/American General | 929L | $20 million |
| Phoenix | 7423 | $10 million |

| Pacific Life | 5380 | $8 million |

19. In 2008, OWNER A made over approximately $800,000 in premium payments on the Policies.

20. On or about June 3, 2009, OWNER A received an analysis showing the expected, and past, premium payments for the Policies. That analysis indicated that the premium obligations on the Policies would be approximately $2 million on an annual basis.

### OWNER A's Liquidity Issues

21. Beginning no later than 2009, OWNER A made multiple late premium payments and also failed to make sufficient premium payments on certain of the Policies, thereby risking policy lapse.  For example:

   a. On or about October 28, 2009, Pacific Life issued a notification to OWNER A that Policy 5380 was in "grace" status because sufficient premium payments had not been made.  That notification also indicated that Policy 5380 would lapse unless OWNER A made a payment of $44,608 by December 28, 2009.  OWNER A failed to make this required payment and Policy 5380 lapsed on December 28, 2009.

   b. On or about December 28, 2009, AIG/American General issued a notification to OWNER A that Policy 929L was in "grace" status because sufficient premium payments had not been made.  The notification also

indicated that Policy 929L would lapse without value unless OWNER A made a payment of $352,000 by February 27, 2010.

    i. After receiving this notification, on or about February 24, 2010, OWNER A emailed American General, copying BENDEROFF and Broker A, to inquire about the "the exact minimum amount of payment I can send in to keep this policy from lapsing . . . ."

    ii. OWNER A ultimately made a sufficient premium payment to prevent this policy's lapse in February 2010.

c. On or about, March 2, 2010, Lincoln Benefit Life notified OWNER A that Policy 0268 had insufficient value and would terminate effective May 2, 2010, unless $34,471 in additional premiums were paid. OWNER A ultimately made this required payment but received multiple additional notifications from Lincoln Benefit Life in 2010 notifying him that the policy again had insufficient value and risked being terminated.

22. A statement of OWNER A's financial condition, prepared by his financial assistant and dated December 31, 2009, indicated that OWNER A, while owning considerable assets, held about $119,848 in cash and cash equivalents—a fraction of the amount required to maintain the Policies. According to the same statement, OWNER A had a negative cash flow for the year 2009 and owed more than $30 million to various individuals and entities. Among the identified creditors of OWNER A, as of approximately December 31, 2009, were his mother and a fellow member of the board of directors of

6

the company for which OWNER A served as chairman and chief executive officer.

OWNER A's Failed Sales Attempts

23. In or around no later than 2008, OWNER A began to attempt to sell certain Policies. OWNER A's initial attempts were unsuccessful.

   a.  For example, OWNER A unsuccessfully attempted to sell Lincoln Benefit Life Policy #3495 on several occasions:

   b.  In December 2008, Credit Suisse declined to bid on Lincoln Benefit Life Policy #3495 and Lincoln Benefit Life Policy # 5380.

   c.  In January 2009, Credit Suisse again declined to bid on Lincoln Benefit Life Policy #3495.  In analyzing the policy, a Credit Suisse analyst noted: "I'm guessing it still won't work b/c of the long LE's...."  ("LE' is shorthand for life expectancy.)

   d.  In February 2009, Credit Suisse again declined to bid on Lincoln Benefit Life Policy # 3495.  The submission that was made in connection with this bid solicitation included life expectancy reports from life expectancy providers 21st Services and AVS.

      i.  The AVS life expectancy report, dated January 22, 2009, provided a 165 month life expectancy for OWNER A's MOTHER.

      ii.  The 21st Services life expectancy report, dated January 30, 2009, provided a median life expectancy of 149 months and a mean life expectancy of 148 months.

7

    iii.  In deciding not to bid on the policy, a member of Credit Suisse's Life Finance Group noted, in a February 2009 email, that the policy's "economics are not attractive."

### Purpose of the Scheme to Defraud

24. The purpose of the scheme to defraud was for the defendants to obtain money and enrich themselves by, among other things, inducing entities to purchase, through false and fraudulent representations, life insurance policies in which the life of OWNER A's MOTHER was insured.

### The Scheme to Defraud

25. As part of the scheme to defraud, the defendants and one or more co-conspirators caused materially false and fraudulent representations to be made to purchasers of life insurance policies for OWNER A's MOTHER, including false and fraudulent representations regarding the health and life expectancy of OWNER A's MOTHER, and false and fraudulent representations regarding the interests held in the sales of those policies by GONTE.

### The Proceeds-Sharing Agreement between OWNER A and GONTE

26. In or about February 2009, after several unsuccessful attempts to sell the Policies, OWNER A entered into a proceeds-sharing agreement with GONTE in which he granted "an unassignable interest in the proceeds of a sale of life insurance policies on [OWNER A's MOTHER]."

27. The proceeds-sharing agreement, which was dated February 1, 2009 and signed by both OWNER A and GONTE, provided that GONTE would receive

"up to 30% of the proceeds . . . provided that (1) the policies are sold within 24 months of this date . . . (2) the policies are sold in excess of the premiums paid on those policies and . . . (3) for not less than a total of $ 3 million . . . ."

### Broker A Retention

28. On or about February 9, 2009, OWNER A executed a document indicating that a life settlement brokerage firm owned by Broker A, an individual affiliated with BENDEROFF, was the "exclusive [b]roker of [r]ecord" for the sale of Lincoln Benefit Life Policies # 3691 and # 3495; Phoenix Life Insurance Policy # 7423 and Pacific Life Policy # 5380.

29. As part of the scheme to defraud, the defendants utilized Broker A to market the Policies.

### The False Medical Records

30. After being given substantial financial interest in the proceeds of the sale of the Policies, GONTE caused false medical records regarding OWNER A'S MOTHER to be generated. These false records made it appear that OWNER A'S MOTHER was in far worse health than she was in actuality.   For example:

   a.   GONTE caused a false laboratory test report to be generated for OWNER A'S MOTHER on April 17, 2010. That report purported to represent the results of an examination of OWNER A'S MOTHER's blood that was ostensibly collected on April 16, 2010. In reality, however, this report did not represent the results of an examination of OWNER A'S MOTHER's

blood but rather a substitute material that GONTE had fraudulently caused to be submitted to the laboratory in place of OWNER A'S MOTHER's blood.

    i.   The false blood test report that GONTE caused to be generated made it appear that OWNER A'S MOTHER was in far worse health than she was in actuality. For example, according to the false report, OWNER A'S MOTHER's glucose level on April 16, 2010 was 296 and her A1C level was 10.6. These results are indicative of a diagnosis of diabetes.

    ii.   OWNER A'S MOTHER did not, in actuality, have diabetes in April 2010. In fact, OWNER A'S MOTHER'S physician had ordered a blood test for blood that was collected from her on April 12, 2010—four days prior to the purported collection date in the false report that GONTE caused to be generated. That true report indicated that OWNER A'S MOTHER's glucose level on April 12, 2010 was 99—a non-diabetic result.

The False Life Expectancy Reports

31. After GONTE generated false medical records for OWNER A'S MOTHER, the defendants caused those false records to be submitted to life expectancy providers.

32. Life expectancy providers, believing the false medical records generated by GONTE to be legitimate, created life expectancy reports for OWNER A'S MOTHER that contained artificially low life expectancy projections.

33. The defendants then caused the false life expectancy reports to be submitted to potential purchasers. These false life expectancy reports made the Policies appear to be more valuable than they were in actuality. For example:

a. As part of the marketing for Lincoln Benefit Life Policy # 3495, the defendants caused a false 21st Services life expectancy report for OWNER A'S MOTHER to be submitted to Credit Suisse in approximately May 2010. That report, dated May 4, 2010, provided a <u>false median life expectancy of 94 months and a false mean life expectancy of 93 months</u>. This report also falsely represented that OWNER A'S MOTHER had a number of medical complications, including poorly controlled diabetes.

b. The defendants also caused a false AVS life expectancy report for OWNER A'S MOTHER to be submitted to Credit Suisse in approximately May 2010. This report, dated May 17, 2010, provided a <u>false 90 month life expectancy</u> for OWNER A'S MOTHER

  i. Less than four months earlier, on January 27, 2010 AVS had issued a report that projected a 170-month life expectancy for OWNER A'S MOTHER, meaning that OWNER A'S MOTHER's life expectancy had purportedly fallen more than six years over the course of less than four months.

c. The defendants also caused another false AVS life expectancy report for OWNER A'S MOTHER to be submitted to Credit Suisse in approximately July 2010. Among the false representations contained in that report, which was dated May 17, 2010, was a claim that, in April 2010, OWNER A'S MOTHER had a glucose level of 296 and had "poorly controlled" diabetes.

### Credit Suisse's Bid

34. On or about July 2010, Credit Suisse offered to purchase Lincoln Benefit Life Policy # 3495, which it had previously declined to bid on, for $2.1 million, based, at least in part, on the false, fraudulent and misleading information regarding OWNER A'S MOTHER's health and her life expectancy that the defendants had caused to be submitted to Credit Suisse.

### The Fraudulent Life Insurance Settlement Application (Lincoln Benefit Life Policy #3495)

35. On or about August 2010, OWNER A signed a life insurance settlement application that was submitted to Credit Suisse as part of the closing process for the sale of Lincoln Benefit Life Policy #3495. In that application, OWNER A acknowledged that his reason for selling Lincoln Benefit Life Policy #3495 was that the "premium carry has become burdensome."

36. The Credit Suisse settlement application listed GONTE as OWNER A'S MOTHER's primary physician.

37. The Credit Suisse settlement application asked whether "any person other than the insured (the 'insured'), a family member of the insured(s) or an estate

planning vehicle (of which all of the owners and/or beneficiaries thereof are family members of the insured(s) ever owned, directly or indirectly, the policy or any interest therein?"

38. Despite the proceeds-sharing agreement between OWNER A and GONTE that granted GONTE an interest in the sale proceeds of Lincoln Benefit Life Policy #3495, the "no" box was falsely checked on the signed life insurance settlement application for the sale of Lincoln Benefit Life Policy #3495.

<u>The Closing of Lincoln Benefit Life Policy #3495</u>

39. On or about September 8, 2010, Wells Fargo Bank, N.A. made an interstate wire transfer of approximately $1.9 million to OWNER A as payment for the purchase of Lincoln Benefit Life Policy #3495.

40. On or about September 10, 2010, Wells Fargo Bank, N.A. made an interstate wire transfer of approximately $200,000 to Broker A as payment for the purchase of Lincoln Benefit Life Policy #3495.

<u>The Fraudulent Sale of Other Policies</u>

41. As part of the scheme to defraud, the defendants and one or more co-conspirators caused other Policies to be sold by false and fraudulent representations, including false and fraudulent representations regarding the health and life expectancy of OWNER A'S MOTHER, and false and fraudulent representations regarding the interests held in the sales of those policies by GONTE.

42. For example, Lincoln Benefit Life Policy # 3691 was sold for approximately $1.61 million on or about September 7, 2010, with approximately $1.13 million wired to OWNER A and approximately $480,000 provided to Broker A.

    a. The purchaser of Policy #3691 had also previously received the January 27, 2010 AVS life expectancy report that provided a 170-month life expectancy for OWNER A'S MOTHER The defendants also caused the false May 17, 2010 AVS life expectancy report, which provided a purported life expectancy of 90 months for OWNER A'S MOTHER, to be submitted to this purchaser

    b. On or about June 24, 2010, after receiving the false May 17, 2010 AVS life expectancy report, an employee at the purchasing company noted that OWNER A'S MOTHER appeared to have had a "huge change in health since January."

    c. On or about June 25, 2010, another employee at the purchasing company noted that OWNER A'S MOTHER "has had a very significant change in health since January."

    d. In reality, OWNER A'S MOTHER had not had either a "huge" or "very significant" change in her health between January 2010 and May 2010— the defendants had caused false and fraudulent representations regarding her health to be made.

e. Based, at least in part, on these false and fraudulent representations regarding OWNER A'S MOTHER's life expectancy and health, Lincoln Benefit Life Policy #3691 was sold.

### The Plan to Lull and Ongoing Lulling Communications

43. Before purchasing the Policies, certain purchasers required the designation of specific contact individuals for OWNER A'S MOTHER who would provide ongoing information regarding her medical condition and whereabouts after the Policies were purchased.

44. Rather than listing individuals who were actually friends or associates of OWNER A'S MOTHER, the defendants identified BENDEROFF and GONTE as contacts for OWNER A'S MOTHER

45. The defendants selected BENDEROFF and GONTE as contacts for OWNER A'S MOTHER with the intent to lull victims into a false sense of security regarding their purchase of the Policies and make it less likely that the fraudulent scheme would be discovered.

46. For example:

a. On or about August 18, 2010, the defendants caused BENDEROFF and GONTE to be identified as designated contacts of OWNER A'S MOTHER in connection with the sale of Lincoln Benefit Life Policy #3691. These contacts were specifically designated for the purpose of providing future information regarding OWNER A'S MOTHER's "whereabouts, medical

condition and attending physician . . . ." BENDEROFF was falsely identified as OWNER A'S MOTHER's "friend" on this designation.

b. On or about August 18, 2010, the defendants caused BENDEROFF and GONTE to be identified as designated alternate contacts of OWNER A'S MOTHER in connection with the sale of Lincoln Benefit Life Policy #3495. These contacts were specifically designated for the purpose of providing future information "on a quarterly basis" regarding OWNER A'S MOTHER's "medical status and place of residence." BENDEROFF was falsely identified as OWNER A'S MOTHER's "friend" on this designation.

47. BENDEROFF did, in fact, provide updates regarding OWNER A'S MOTHER's purported medical status until at least 2017—years after the Policies were sold. For example:

a. On or about March 24, 2016, BENDEROFF indicated, in a phone conversation, that OWNER A'S MOTHER was in stable health.

b. On or about September 22, 2016, BENDEROFF indicated, in a phone conversation, that OWNER A'S MOTHER was in stable health.

c. On or about March 22, 2017, BENDEROFF indicated, in a phone conversation, that OWNER A'S MOTHER was in stable health.

48. BENDEROFF provided updates regarding OWNER A'S MOTHER's purported medical status without actually having knowledge of changes to her medical status since he was not, despite what the defendants had represented,

OWNER A'S MOTHER's "friend." BENDEROFF did know, however, that OWNER A'S MOTHER was not "stable" with the purported maladies that GONTE fraudulently diagnosed.

49. In providing ongoing updates regarding OWNER A'S MOTHER's purported medical status, BENDEROFF, as the defendants had originally devised in 2010, aimed to lull victims into a false sense of security regarding their purchase of the Policies and make it less likely that the fraudulent scheme would be discovered.

<u>Financial Compensation</u>

50. As a result of the fraud scheme, the defendants were cumulatively paid millions of dollars.

51. GONTE and BENDEROFF were all aware, prior to the sale of the life insurance policies for insured OWNER A'S MOTHER, that those policies were being marketed utilizing false medical records and inaccurate life expectancy reports.

52. OWNER A provided almost approximately $1.5 million to GONTE after the Policies were sold utilizing the false medicals records and life expectancy reports that GONTE had caused to be generated.

   a. On September 8, 2010, OWNER A emailed his personal assistant and wrote: "can you get a cashiers check made out to Bill Gonte for $150k…?" A cashier's check to GONTE for $150,000 was subsequently issued.

b. OWNER A caused a $360,000 check to be issued to GONTE on September 12, 2010.

c. OWNER A caused a $290,000 check to be issued to GONTE on September 12, 2010.

d. OWNER A caused a $170,000 check to be issued to GONTE on January 26, 2011. The memorandum line on the check noted that it was "for proceeds per agreement."

e. OWNER A caused a $330,000 check to be issued to GONTE on January 26, 2011.

f. OWNER A caused a $196,000 check to be issued to GONTE on March 23, 2011.

53. BENDEROFF received at least several hundred thousand dollars in compensation from Broker A for his role in facilitating the fraudulent sale of the Policies, which included facilitating communications and multiple in-person meetings between the conspirators. Among the compensation that BENDEROFF received for his role in the scheme to defraud were the following payments:

a. Approximately $285,000 of the approximately $480,000 provided to Broker A in connection with the fraudulent sale of Lincoln Benefit Life Policy # 3691 discussed above.

b. Approximately $134,000 of the approximately $200,000 provided to Broker A in connection with the fraudulent sale of Lincoln Benefit Life Policy #3495 discussed above.

54. After the policies for insured OWNER A'S MOTHER were fraudulently sold, BENDEROFF and GONTE also were compensated for their participation in the sale of polices through favorable loan arrangements.

### The Purchasers

55. Credit Suisse and other entities purchased the Policies based on false and fraudulent representations that the defendants and one or more co-conspirators caused to be made, including false and fraudulent representations regarding the health and life expectancy of insured OWNER A'S MOTHER, and false and fraudulent representations regarding the interests held in the sales of those policies by GONTE.

56. Had the purchasers known the true state of OWNER A'S MOTHER's health, her life expectancy, and GONTE's interests in the life settlement transactions, the purchasers would have either purchased the Policies for substantially lower prices or not purchased the Policies at all.

### Interstate Wires

57. In furtherance of the scheme to defraud, the defendants caused interstate wire transfers to be made, including interstate wire transfers of materially false and

fraudulent representations to purchasers of the Policies and interstate wire transfers of payments relating to the sale of those Policies.

## Effect on Financial Institution

58. The scheme to defraud detailed above affected Wells Fargo Bank, N.A., a financial institution, which, to wit, took ownership of certain fraudulently-sold Policies and became the beneficiary of those Policies, by, among other effects, creating new and increased risks of loss, including risks of loss relating to the fees earned by Wells Fargo, time and resources expended in relation to the fraudulent transactions, and risk of litigation.

## **COUNT ONE**
### (18 U.S.C. § 1349 – Conspiracy to Commit
### Wire Fraud Affecting a Financial Institution)

59. Paragraphs 1 through 58 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

60. From at least in or around 2009, through at least in or around 2017, in the Eastern District of Michigan, and elsewhere, the defendants,

### D-1 WILLIAM S. GONTE,
### D-2 BRIAN W. BENDEROFF,

along with others known and unknown, did knowingly, intentionally, and willfully combine, conspire, confederate, and agree to commit wire fraud affecting a financial institution, to wit, Wells Fargo Bank, N.A., that is, knowingly, willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and

property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## Object of the Conspiracy

61. The object of the conspiracy was the same as the purpose of the scheme to defraud set forth in Paragraph 24 of this Indictment, which is realleged and incorporated by reference as though fully set forth herein.

## Manner and Means of the Conspiracy

62. In furtherance of this conspiracy, and to accomplish its object, the methods, manner, and means that were used are described in Paragraphs 1 through 58 of this Indictment and are realleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH SEVEN
(18 U.S.C. §§ 1343 and 2– Wire Fraud Affecting a Financial Institution and Aiding and Abetting)

63. The allegations contained in Paragraphs 1 through 58 are hereby realleged and incorporated by reference as though fully set forth herein.

64. From at least in or around 2009, through at least in or around 2017, in the Eastern District of Michigan, and elsewhere, the defendants,

D-1 WILLIAM S. GONTE, and
D-2 BRIAN W. BENDEROFF,

did knowingly, willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce for the purposes of executing such scheme and artifice.

## Purpose of the Scheme and Artifice to Defraud

65. The Grand Jury realleges and incorporates by reference paragraph 24 of this Indictment as though fully set forth herein as a description of the purpose of the scheme and artifice.

## The Scheme and Artifice to Defraud

66. The Grand Jury realleges and incorporates by reference paragraphs 25 through 56 of this Indictment as though fully set forth herein as a description of the scheme and artifice.

### Effect on a Financial Institution

67. The scheme to defraud detailed above affected Wells Fargo Bank, N.A., a financial institution, which, to wit, took ownership of certain fraudulently-sold Policies and became the beneficiary of those Policies, by, among other effects, creating new and increased risks of loss, including risks of loss relating to the fees earned by Wells Fargo, time and resources expended in relation to the fraudulent transactions, and risk of litigation.

### Use of the Wires

68. On or about the dates specified as to each count below, GONTE and BENDEROFF, in the Eastern District of Michigan and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce for the purposes of executing such scheme and artifice, as set forth below:

| Count | Approximate Date | Description of Wire Communication |
|---|---|---|
| 2 | September 7, 2010 | Interstate wire transfer of approximately $1,130,000 from Wells Fargo Bank, N.A. to OWNER A relating to the sale of Lincoln Benefit Life Policy #3691 |
| 3 | September 8, 2010 | Interstate wire transfer of approximately $1,900,000 from Wells Fargo Bank, N.A. to OWNER A relating to the sale of Lincoln Benefit Life Policy #3495 |
| 4 | September 10, 2010 | Interstate wire transfer of approximately $200,000 from Wells Fargo Bank, N.A. to BROKER A relating to the sale of Lincoln Benefit Life Policy #3495 |

| 5 | March 24, 2016 | Lulling interstate telephone conversation between BRIAN BENDEROFF and Mills, Potoczak, and Co. regarding OWNER A'S MOTHER's health status |
| 6 | September 22, 2016 | Lulling interstate telephone conversation between BRIAN BENDEROFF and Mills, Potoczak, and Co. regarding OWNER A'S MOTHER's health status |
| 7 | March 22, 2017 | Lulling interstate telephone conversation between BRIAN BENDEROFF and Mills, Potoczak, and Co. regarding OWNER A'S MOTHER's health status |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE ALLEGATION

(18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2467(c)
(18. U.S.C. § 982(a)(1)(A))

69. The allegations contained in Counts 1, 2, 3, 4, 5, 6, and 7 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture against the defendants, WILLIAM GONTE, and BRIAN BENDEROFF, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

70. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon being convicted of the crimes charged in Count 1, the defendants, WILLIAM GONTE and BRIAN BENDEROFF, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of the offense.

71. Substitute Assets:  If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

has been commingled with other property that cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b), to seek to forfeit any other property of the defendants.

THIS IS A TRUE BILL

*s/Grand Jury Foreperson*
Grand Jury Foreperson

MATTHEW SCHNEIDER
United States Attorney

John K. Neal
Assistant U.S. Attorney
Chief, White Collar Crime Unit

*s/Andrew J. Yahkind*
Andrew J. Yahkind
Mark J. Chasteen
Assistant U.S. Attorneys

Dated:  August 26, 2020

| United States District Court<br>Eastern District of Michigan | Criminal Case Co | Case: 2:20-cr-20380<br>Judge: Edmunds, Nancy G.<br>MJ: Grand, David R.<br>Filed: 08-26-2020 At 03:45 PM<br>INDI USA V. GONTE ET AL (DA) |

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to co

| Companion Case Information | Companion Case Number: |
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | Judge Assigned: |
| ☐ Yes    ☒ No | AUSA's Initials: *AJY* |

**Case Title:** USA v. D-1 WILLIAM S. GONTE, D-2 BRIAN W. BENDEROFF

**County where offense occurred :** Oakland

**Check One:**    ☒ **Felony**         ☐ **Misdemeanor**         ☐ **Petty**

✓ Indictment/____Information --- **no prior complaint.**
____Indictment/____Information --- based upon prior complaint [Case number:                     ]
____Indictment/____Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below].*

## Superseding Case Information

**Superseding to Case No:** _____    **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |

Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.

August 26, 2020
Date

Andrew J. Yahkind
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3277
Phone: (313) 226-9565
Fax:    (313) 226-2873
E-Mail address: andrew.yahkind@usdoj.gov
Attorney Bar #:

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.