# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff              Case No. 20-cr-20380

vs.                                  Honorable Nancy G. Edmunds

BRIAN W. BENDEROFF,

                Defendant.

_____/

## **DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Defendant Brian W. Benderoff, by and through his undersigned counsel, moves this Court to suppress statements taken from him by the government in violation of his rights under the Fourth and Fifth Amendments.

On June 23, 2016, Mr. Benderoff was met at his gate by federal law enforcement agents and canines as he arrived at the Detroit Metropolitan Airport on a Delta flight from Las Vegas International Airport.  Without reasonable suspicion or probable cause, agents immediately took Mr. Benderoff into custody, drove him to an offsite location and held him in a locked prisoner holding cell for more than *nine hours* before he made the statements that are the subject of this suppression motion.  Neither reasonable suspicion nor probable cause were developed by law

i

enforcement officers during the entire time Mr. Benderoff was held against his will. These statements are the fruit of his unlawful detention and arrest and cannot be used to prosecute him.

In addition, these statements should be suppressed on the independent ground that they were not made voluntarily, in violation of Mr. Benderoff's Fifth Amendment rights. While Mr. Benderoff signed a *Miranda* waiver form early in his illegal detention, his will was easily overborne by the coercive actions of law enforcement during the nine hours they held him in an eight-by-six-foot cell without his consent before he uttered a single incriminating word.

For these reasons and those more fully set forth in the accompanying Brief in Support, Mr. Benderoff asks that this Court grant his motion to exclude and suppress all evidence obtained as the result of his unlawful detention and arrest on June 23, 2016.

Counsel for Mr. Benderoff sought concurrence from the government pursuant to Local Rule 7.1(a) and it was denied.

Respectfully submitted,

/s/ *R. Michael Bullotta*
R. MICHAEL BULLOTTA
Attorney for Brian Benderoff
615 Griswold, Suite 1620
Detroit, MI 48226
(313) 400-5776
Dated:  May 25, 2022        michael@bullottalaw.com

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff                    Case No. 20-cr-20380

vs.                                              Hon. Nancy G. Edmunds

BRIAN W. BENDEROFF,

                    Defendant.

_____/

## DEFENDANT'S BRIEF IN SUPPORT OF
## HIS MOTION TO SUPPRESS EVIDENCE

i

## **CONCISE STATEMENT OF THE ISSUES PRESENTED**

I.  Whether Mr. Benderoff was unlawfully detained without reasonable, articulable suspicion when he was met by armed law enforcement officers at the airport gate and ordered to go with them, in violation of his Fourth Amendment rights?

Mr. Benderoff answers, "Yes."
This Court should answer, "Yes."
The government presumably answers, "No."

II.  Whether Mr. Benderoff was unlawfully arrested without probable cause in violation of his Fourth Amendment rights when he was taken to an offsite Homeland Security Investigations Building, confined in a prisoner cell for over 10 hours without his consent, and questioned in four different interrogations?

Mr. Benderoff answers, "Yes."
This Court should answer, "Yes."
The government presumably answers, "No."

III.  Whether Mr. Benderoff's statements are the product of his unlawful detention and arrest, and, therefore, must be suppressed in their entirety?

Mr. Benderoff answers, "Yes."
This Court should answer, "Yes."
The government presumably answers, "No."

IV.  Whether Mr. Benderoff's statements were involuntary, and, therefore, must be suppressed under the Fifth Amendment?

Mr. Benderoff answers, "Yes."
This Court should answer, "Yes."
The government presumably answers, "No."

## **CONTROLLING OR MOST APPROPRIATE AUTHORITY**

*Brown v. Illinois,*
  422 U.S. 590 (1975)

*Mincey v. Arizona,*
  437 U.S. 385 (1978)

*Miranda v. Arizona*,
  384 U.S. 436 (1966)

*Reid v. Georgia*,
  448 U.S. 438 (1980)

*Terry v. Ohio,*
  392 U.S. 1 (1968)

*United States v. Beauchamp*,
  659 F.3d 560 (6th Cir. 2011)

*United States v. Shaw*,
  464 F.3d 615 (6th Cir. 2006)

# **TABLE OF CONTENTS**

CONCISE STATEMENT OF THE ISSUES PRESENTED ................................... ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................. iii

INDEX OF EXHIBITS ............................................................................................x

I.      INTRODUCTION .......................................................................................1

II.     STATEMENT OF FACTS ...........................................................................1

        A.      Las Vegas Gambling Trip ...................................................................1

        B.      Departure from Las Vegas International Airport .................................2

        C.      Arrival at Detroit Metropolitan Airport .............................................4

        D.      Ten And a Half Hours in Custody at the HSI Building .......................9

                1.      First Interrogation – 1:38 p.m. .................................................13

                2.      Second Interrogation – Time Unknown.....................................20

                3.      Agent Helmerson Calls Mr. Benderoff's Wife – 5:30 p.m.......21

                4.      Third Interrogation (Time Unknown) – Agents Bargain to
                        Release Mr. Benderoff In Exchange for Information..............22

                5.      Fourth Interrogation – 11:00 p.m.............................................24

III.    APPLICABLE LAW ...................................................................................27

        A.      Fourth Amendment ...........................................................................27

                1.      "Seizure" Defined ...................................................................27

                2.      Warrantless ''Arrest on Probable Cause...................................28

                3.      Investigatory Stop, aka, *Terry* Stop ..........................................28

                4.      Consent....................................................................................29

                5.      Exclusionary Rule/ Fruit of the Poisonous Tree......................30

        B.      Fifth Amendment ..............................................................................32

IV.     ARGUMENT.................................................................................................33

A.   Mr. Benderoff Was Unlawfully Detained Without Reasonable Suspicion When He Was Met by Law Enforcement Officers at His Gate.............................................................................................33

    1.   Mr. Benderoff Did Not Consent to Going with the Officers....33

    2.   There Was No Reasonable, Articulable Suspicion; therefore Mr. Benderoff's Initial Detention Was Unlawful.....................37

B.   Mr. Benderoff Was Unlawfully Arrested Without Probable Cause When He Was Taken To the HSI Building and Confined in a Prisoner Cell For Over Ten Hours....................................................................42

    1.   Mr. Benderoff Was Under Arrest and *Did Not Consent* to Be Present at the HSI Building.......................................................42

    2.   Any "Consent" Was Withdrawn by Mr. Benderoff.................44

    3.   There Was No Probable Cause and None Was Developed......45

C.   Mr. Benderoff's Statements Were the Product of His Unlawful Arrest and Therefore Must Be Suppressed ...................................................46

D.   Mr. Benderoff's Statements Were Not Voluntary, and Therefore Must Be Suppressed ......................................................................................49

V.   CONCLUSION..............................................................................................53

# INDEX OF AUTHORITIES

**Cases**

*Brendlin v. California*,
  551 U.S. 249 (2007)...........................................................................27

*Brown v. Illinois*,
  422 U.S. 590 (1975)..................................................... 31, 47, 48, 49

*Chavez v. Martinez*,
  538 U.S. 760 (2003)...........................................................................49

*Colorado v. Connelly*,
  479 U.S. 157 (1986)...........................................................................49

*Dunaway v. New York*,
  442 U.S. 200 (1979).................................................... 29, 31, 36, 42

*Family Service Assoc. v. Wells Township*,
  783 F.3d 600 (6th Cir. 2015) ...........................................................40

*Florida v. Bostick*,
  501 U.S. 429 (1991)............................................................ 27, 34, 37

*Florida v. Royer*,
  460 U.S. 491 (1983)................................................................. passim

*Haynes v. Washington*,
  373 U.S. 503 (1963)...........................................................................50

*Ledbetter v. Edwards*,
  35 F.3d 1062 (6th Cir. 1994) ...........................................................50

*Mincey v. Arizona*,
  437 U.S. 385 (1978)................................................................. 50, 51

*Miranda v. Arizona,*
    384 U.S. 436 (1966) ........................................................................ passim

*Missouri v. McNeely,*
    569 U.S. 141 (2013) ................................................................................27

*Ornelas v. United States,*
    517 U.S. 690 (1996) ................................................................................38

*Painter v. Robinson,*
    185 F.3d 557 (6th Cir. 1999) ........................................................... 30, 44

*Reid v. Georgia,*
    448 U.S. 438 (1980) .......................................................................... 39, 40

*Schneckloth v. Bustamonte,*
    412 U.S. 218 (1973) ................................................................................29

*Terry v. Ohio,*
    392 U.S. 1 (1968) .................................................................. 27, 28, 33, 38

*United States v. Beauchamp,*
    659 F.3d 560 (6th Cir. 2011) ........................................................... 35, 36

*United States v. Bowman,*
    884 F.3d 200 (4th Cir. 2018) ........................................................... 35, 40

*United States v. Brignoni-Ponce,*
    422 U.S. 873 (1975) ................................................................................42

*United States v. Brown,*
    925 F.3d 1150 (9th Cir. 2019) ................................................................40

*United States v. Buckingham,*
    433 F.d 3d 508 (6th Cir. 2006) ...............................................................30

*United States v. Delaney,*
  955 F.3d 1077 (D.C. Cir. 2020).............................................................40

*United States v. Lawrence,*
  735 F.3d 385 (6th Cir. 2013) ...............................................................32

*United States v. Mahan*,
  190 F.3d 416 (6th Cir. 1999) ...............................................................33

*United States v. McKoy,*
  428 F.3d 48 (1st Cir. 2005)..................................................................41

*United States v. Neff,*
  681 F.3d 1134 (10th Cir. 2012) ...........................................................40

*United States v. Palmer,*
  820 F.3d 640 (4th Cir. 2016) ...............................................................41

*United States v. Ruiz-Estrella,*
  481 F.2d 723 (2d Cir. 1973) ................................................................35

*United States v. Rutherford*,
  555 F.3d 190 (6th Cir. 2009) ................................................... 33, 50, 52

*United States v. Shaw*,
  464 F.3d 615 (6th Cir. 2006) ...............................................................48

*United States v. Taylor,*
  745 F.3d 15 (2d Cir. 2014) ..................................................................50

*United States v. Uribe,*
  709 F.3d 646 (7th Cir. 2013) ...............................................................40

*United States v. Watson,*
  423 U.S. 411 (1976)............................................................................28

*United States v. Watson,*
   489 F. App'x 922 (6th Cir. 2012) ..........................................................................48

*United States v. Weidul,*
   325 F.3d 50 (1st Cir. 2003) ..................................................................................35

*United States v. Worley,*
   193 F.3d 380 (6th Cir. 1999) ......................................................................... 30, 36

*United States. v. Mendenhall,*
   446 U.S. 544 (1980) ............................................................................................28

*Withrow v Williams,*
   507 U.S. 680 (1993) ............................................................................................50

*Wong Sun v. United States,*
   371 U.S. 471 (1963) ....................................................................................... 31, 47

*Ybarra v. Illinois,*
   444 U.S. 85 (1979) ..............................................................................................41

## Other Authorities

U.S. CONST. amend. IV .........................................................................................27

# <u>INDEX OF EXHIBITS</u>

**Exhibit A**        Benderoff Dec.

**Exhibit B**        Itinerary

**Exhibit C**        TSA Blotter

**Exhibit D**        Tip Line Report

**Exhibit E**        Email to T. Cranmer

**Exhibit F**        Williams Report

**Exhibit G**        Jaworski Dec.

**Exhibit H**        TFO Adamisin Report

**Exhibit I**        Dr. Soverinsky Dec.

**Exhibit J**        Consent to Search Form

**Exhibit K**        Statement of Rights Form

**Exhibit L**        Williams Second Report

**Exhibit M**        Helmerson Report

**Exhibit N**        Mosher Dec.

**Exhibit O**        Consent to Search Form

**Exhibit P**        Caesars Casino Records

**Exhibit Q**        Vaughan Report

## I.    INTRODUCTION

The criminal case at bar against Brian Benderoff is based, almost exclusively, on statements provided by him to law enforcement officers following more than nine hours of unlawful detention in a locked holding cell inside a government building a few miles from the Detroit Metropolitan Airport.  Without those unlawfully obtained statements, there would be no federal criminal case.  Because those statements were taken in violation of Mr. Benderoff's Fourth and Fifth Amendment rights, they must be suppressed by this Court.

## II.    STATEMENT OF FACTS

### A.  <u>Las Vegas Gambling Trip</u>

In June 2016, Brian Benderoff spent three weeks in Las Vegas, Nevada, along with two friends, Dr. William Gonte (co-defendant) and attorney Robert Gross.  The primary reason for the trip was for Brian Benderoff to gamble at Las Vegas casinos, as he had done in the past.  In fact, Mr. Benderoff was a professional blackjack player.  He had recently earned approximately $3 million playing blackjack at the Wynn casino in Las Vegas.  The June trip was successful to a lesser degree, as Mr. Benderoff won almost one million dollars playing blackjack at Caesars Palace casino.  Upon cashing out at Caesars, the casino provided Mr. Benderoff his cash winnings wrapped in Caesars Palace casino money wrappers.  The money was all in $100 bills in thin stacks of $10,000.  The casino provided numerous pages of

documentation of Mr. Benderoff's monetary transactions with the casino, documents that demonstrate that the money he carried on the plane back to Detroit was lawful casino winnings rather than cash from some unlawful source.  (**Ex. P**, Caesars Casino Records).

## B.  Departure from Las Vegas International Airport

On June 23, 2016, at about 4:00 a.m., Mr. Benderoff and Dr. Gonte were dropped off by a Caesars Palace courtesy car at the Las Vegas International Airport in advance of their 6:00 a.m. return flight to Detroit.  They each checked several bags containing their clothing.  Mr. Gross had already returned to his home in Michigan.  Mr. Benderoff had approximately $880,000 of his cash winnings in his carry-on bag along with documentation from the casino.  (**Ex. P**).  The money was still wrapped in official Caesars Palace casino money wrappers.  Dr. Gonte carried additional cash in his carry-on bag.  Neither Mr. Benderoff nor Dr. Gonte took any steps to conceal the money.  (**Ex. A,** Benderoff Dec. ¶¶ 5-7).

At approximately 4:25 a.m., while Dr. Gonte was going through the pre-boarding screening check, TSA Supervisory Officer James King noticed the money and stopped Dr. Gonte briefly to inquire.  Dr. Gonte explained that the cash he was carrying was won gambling while in Las Vegas. Officer King accepted the explanation and allowed Dr. Gonte to proceed to the gate to board his flight.  Mr. Benderoff was not stopped or questioned about the money he was carrying.  (**Ex. A,**

¶ 8). He and Dr. Gonte boarded Delta flight 1593 direct to Detroit, with a scheduled arrival time of 1:02 p.m. (**Ex. B,** Itinerary). Despite Dr. Gonte being briefly questioned, Mr. Benderoff correctly believed that he was not doing anything illegal by carrying the money he had won at the casino. (**Ex. A, ¶** 8). There is no limit or reporting requirement for transporting cash on domestic flights.

Officer King recorded his contact with Dr. Gonte in a TSA blotter. King's blotter entry stated that the money Dr. Gonte was carrying was won at a casino and that it was, "no[t] artefully (sic) concealed, just laying in bag." (**Ex. C,** TSA Blotter). Officer King also notified Officer Loredana Mista, who works at the TSA Coordination Center. Officer Mista, in turn, notified the Homeland Security Investigations ("HSI") Tip Line. Officer Mista's notification was documented by HSI employee Jamin Whitehead in an HSI Tip Line Report. (**Ex. D,** Tip Line Report). This report would later be received by HSI agents working at the Detroit Metropolitan Airport. According to the report, Dr. Gonte was carrying between $200,000 to $250,000 in cash in his carry-on bag and had advised TSA that he won the money at a casino. The report stated that the "concealment method" of the money was carry-on luggage. *Id.* There was no mention of Brian Benderoff and no mention of any suspected criminal activity. *Id.*

3

### C.  **Arrival at Detroit Metropolitan Airport**

Their flight from Las Vegas arrived early to Detroit, touching down at about noon, an hour before its scheduled arrival time.  Mr. Benderoff and Dr. Gonte had flown first class; thus, they were among the first passengers to walk off the plane into the gate area.  **(Ex. A**, ¶ 9).  As soon as he did so, Mr. Benderoff saw four armed law enforcement officers with at least one police dog about 30 feet away. (*Id.* ¶ 10).

One of the officers, later identified as Task Force Officer ("TFO") Erik Johansen, motioned with his finger for Mr. Benderoff to come to him.  *Id.*  Mr. Benderoff and Dr. Gonte walked over to the Officers.  *Id.*  TFO Johansen asked Mr. Benderoff if he was Brian Benderoff, and Mr. Benderoff said that he was.  TFO Johansen asked to see identification, and Mr. Benderoff provided his Michigan driver's license.  TFO Johansen said words to the effect of, "we need to speak with you," and Mr. Benderoff said, "okay."  (*Id.* at ¶¶ 11-12).

At the time, Mr. Benderoff felt that he had no choice but to go with TFO Johansen and the officers, given their display of authority and the fact that they had met him at the gate and singled him out. (*Id.* at ¶ 12).  Neither TFO Johansen, nor any other officer, told Mr. Benderoff that he did not have to go with them or that he was free to leave the airport.  *Id.* TFO Johansen asked Mr. Benderoff if he had checked bags, and he told TFO Johansen that he did.  TFO Johansen said words to the effect of, "we are going to go down to the baggage area to get your bags."  (*Id.*

at ¶ 13).   Mr. Benderoff complied and walked from the gate, flanked by TFO Johansen and another officer.   Mr. Benderoff asked TFO Johansen what this was about and TFO Johansen responded by telling Mr. Benderoff not to talk.   Mr. Benderoff, who by this time was extremely anxious, stated that he needed to use the bathroom. (*Id.* at ¶ 14).

After initially refusing, TFO Johansen allowed Mr. Benderoff to use an airport bathroom.  (*Id.* at ¶ 14).   TFO Johansen stood outside the bathroom entrance and TFO Joseph Presley escorted Mr. Benderoff inside the bathroom and stood just outside the stall Mr. Benderoff was using.[1] (*Id.* at ¶ 15).   While in the bathroom stall guarded by TFO Presley, Mr. Benderoff was panicked.   He used his cell phone to begin writing an email to his then business attorney, Thomas Cranmer.   He typed, "I'm in trouble" in the subject line of the email.   While Mr. Benderoff was doing this, TFO Presley stated in an authoritative voice words to the effect of, "What are you doing?  Hurry up." (*Id.* at ¶ 16).   Mr. Benderoff, feeling pressure to leave the stall, sent the email off without ever typing a word in the body. (*Id.*; **Ex. E,** Email). According to the email, it was sent at 12:35 p.m.  (**Ex. E).**   Mr. Cranmer would answer with a text message to Mr. Benderoff five hours later.

---

[1]  The government provided the name of the officer (TFO Presley) who went into the bathroom with Mr. Benderoff.  The fact that an officer went into the bathroom with Mr. Benderoff and stood outside the stall is not reflected in any of the law enforcement reports related to this case.

Some of the events discussed above are recounted in the report of HSI Special Agent Michael Williams.  His report reads, in pertinent part:

> On June 23, 2016, at 1235 hours HSI/DMA Special Agents and Task Force Officer(s) (TFO) met with Brian BENDEROFF and William GONTE as they exited Delta flight #1932 at Detroit Metropolitan Airport gate A-7.  TFO Johansen advised both BENDEROFF and GONTE that he was with the Detroit Metro Airport Police and asked them if they had identification.  Both provided Michigan driver's licenses.  TFO Johansen asked them if we could speak with them.  BENDEROFF appeared very nervous and said he would talk but he needed to use the restroom…BENDEROFF was ***allowed*** to use the restroom…  (**Ex. F**, Williams Report, pp. 2-3) (emphasis added).

Mr. Benderoff was escorted out of the bathroom by TFO Presley.  By this time, Mr. Benderoff recalls that he no longer had his carry-on bag containing the money and casino documentation.  However, he does not remember when it was taken from him by law enforcement.  (**Ex. A, ¶** 17).  Mr. Benderoff was flanked on either side by TFO Johansen and another officer, who walked him to an escalator.  Mr. Benderoff was taken downstairs to the baggage claim area.  *Id.*  On this topic, SA Williams' report reads:

> "BENDEROFF was *allowed* to use the restroom and then was *accompanied to the baggage area* to retrieve six checked bags with GONTE."

(**Ex. F,** p. 3) (emphasis added).

While standing in the baggage claim area with the officers, Mr. Benderoff noticed Metro Cars driver Michael Jaworski standing nearby holding a tablet with Mr. Benderoff's name on it.  Mr. Benderoff was not permitted to speak with Mr. Jaworski.  (**Ex. A, ¶** 18).

6

According to Mr. Jaworski, Mr. Benderoff had messaged him the previous day requesting a pick up from the airport.  (**Ex. G,** Jaworski Dec., ¶ 3).  Mr. Jaworski had driven Mr. Benderoff on previous occasions.  *Id.*  After arriving at the airport and parking in the Metro Cars lot, Mr. Jaworski went into the baggage claim area to meet Mr. Benderoff to help him with his bags.  (*Id.* ¶ 4).  Mr. Jaworski was holding a tablet with Mr. Benderoff's name on it.  *Id.*  Mr. Jaworski saw Mr. Benderoff in the baggage area.  However, before Mr. Jaworski could make contact with Mr. Benderoff, he was approached by two law enforcement officers who told him his services were not needed and that he should leave the airport. (*Id.* ¶ 5-6).

Mr. Jaworski was surprised that Mr. Benderoff did not approach him to tell him what was going on or try to pay him for coming to the airport to get him. (*Id.* ¶ 7).  Mr. Jaworski specifically remembers one of the officers telling him that Mr. Benderoff was not going anywhere.  (*Id.* ¶ 6).

Mr. Benderoff identified his checked suitcases containing his clothing. Officers grabbed them from the carousel and took custody of them.  (**Ex. A,** ¶ 19). Mr. Benderoff was then escorted by TFO Johansen to a government SUV driven by SA Williams, while officers maintained custody of his carry-on and checked luggage.  *Id.*  SA Williams (with another officer in the passenger seat) drove Mr. Benderoff to an offsite building approximately two miles from the airport that houses the HSI Prisoner Processing Unit.  (*Id.* at ¶ 20).  Dr. Gonte was taken to that same

7

location in a separate government SUV.  Mr. Benderoff did not get into the SUV to travel to an offsite location because he wanted to; he simply did not believe that he had a choice not to get into the vehicle and go with the agents.  *Id.*  No government agent told him he had a choice to decline or that he was free to leave.  *Id.*  These events are captured in SA Williams' report as follows:

> All six of the checked bags were removed from the carousel [by law enforcement] and BENDEROFF and GONTE were transported to the HSI Resident Agent in Charge (RAC) office.

(**Ex. F,** p. 3).  Significantly (and consistent with Mr. Benderoff's understanding that he was not free to leave), the report is devoid of any mention of Mr. Benderoff consenting to traveling to the offsite building.  *Id.*  Nor does SA Williams' report indicate that any law enforcement officer told Mr. Benderoff he had a choice to decline to go there or that he was free to leave.[2] *Id.*

Mr. Benderoff's detention was contemporaneously noted by Nevada state authorities.  In this June 23, 2016 email from Nevada Gaming Control Board Agent

---

[2]  As part of the discovery in this case, defendant was provided a copy of a report by TFO Adamisin, who was a Taylor Police Officer working at the airport. (**Ex. H).**  TFO Adamisin searched Mr. Benderoff's and Dr. Gonte's luggage later that afternoon.  In his report, TFO Adamisin writes, "HSI Agents made contact with Gonte and Benderoff at the gate in the McNamara Terminal.  Gonte and Benderoff both gave consent to travel to the HSI RAC office to talk with Agents." *Id.* at 2.   It is unclear, however, whether TFO Adamisin ever had any actual contact with Brian Benderoff that day.  Indeed, he is not among the seven agents and TFOs who are mentioned in the documented interactions with Mr. Benderoff that day.  Those were TFO Johansen, TFO Presley, SA Williams, SA Brian Helmerson, SA Mark Vaughan, SA Devallons Desmarets and SA Jerome Deaven.  In no report associated with those officers is there a statement that Mr. Benderoff consented to be taken offsite and interrogated.  TFO Adamisin appears to be summarizing the events prior to his search of the luggage based on his belief of what occurred but without any direct knowledge.

James Sibbert to Harrah's employee Edward Pryor, Agent Sibbert writes that the Gaming Control Board received word that Mr. Benderoff had been "*detained* at the Detroit airport." (emphasis added).



### D.  Ten And a Half Hours in Custody at the HSI Building

Mr. Benderoff would spend the next ten and a half hours, from approximately 1:00 p.m. to 11:30 p.m., in the custody of Homeland Security Investigations agents at their offsite building a couple miles from the airport.

When the government SUV arrived at the HSI building, a garage door opened and the SUV drove inside.  The garage door closed behind Brian Benderoff, who sat in the back of the government car.  This is a photograph of that door and the garage where the SUV parked:



One of the officers escorted Mr. Benderoff from the vehicle into a fairly small area

inside the building marked "Prisoner Processing," as seen in the picture below.



The door to the area is locked and only accessible with a key card, as depicted in the

photo above.  After entering the locked door to the Prisoner Processing area, the

officer led Mr. Benderoff to a small prisoner cell, approximately 8 feet by 6 feet in

10

size.  The officer had to use a key card to open a locked door to enter. **(Ex. A, ¶** 21).

This photograph shows the door to enter the prisoner cell.



Mr. Benderoff was terrified.  He pleaded with the officer who took him to the cell

not to make him go inside, explaining that he suffered from an anxiety disorder and

claustrophobia.  **(Ex. A, ¶** 21).  Over Mr. Benderoff's strong objection, the officer

told Mr. Benderoff that he had no choice but to enter and remain in the cell.  *Id.*

Mr. Benderoff had previously been diagnosed with Severe Generalized

Anxiety Disorder and claustrophobia (**Ex. I**, Dr. Soverinsky Dec., ¶ 3).  It is Dr.

Soverinsky's opinion, after treating Mr. Benderoff for 16 years, that Mr. Benderoff

would never voluntarily agree to be housed in a locked prisoner cell for any period

of time.  (*Id.* at ¶ 6).  According to Mr. Benderoff's wife, he is so afraid of being

locked in an enclosed space that she has to stand outside the public restroom at

Starbucks when he needs to use the facilities, as he is unable to lock the door for fear

of being locked inside.  Mr. Benderoff also has a substantial fear of elevators.[3]  (**Ex. N, ¶ 3**).

Mr. Benderoff was overwhelmed by anxiety and fear.  He would spend the vast majority of the next ten plus hours suffering inside that small cell.  As seen in the photograph below, the cell contained only a prison-style toilet and sink combination and a single slab for seating.



The cell door had no door knob.  Mr. Benderoff was locked in, and could only get out when permitted by the agents.  Below is a photograph of the door from the inside of the cell:

---

[3] Undersigned counsel can attest to Mr. Benderoff's fear of elevators.  When meeting with his counsel, whose offices are on the 16th floor, Mr. Benderoff has the door attendant ride the elevator up with him.  At the conclusion of the meetings, counsel rides down the elevator with Mr. Benderoff.



For the first 30 minutes, Mr. Benderoff sat alone in the locked cell, anxious and afraid, screaming to get out and sobbing intermittently.   While it was warm outside this June afternoon, the cell was extremely cold. (*Id.* at ¶ 22).   At approximately 1:38 p.m., agent Williams and TFO Presley let Mr. Benderoff out of his cell to interrogate him regarding the source of the cash he had been carrying in his bag.

1. **First Interrogation – 1:38 p.m.**

Mr. Benderoff was taken out of the cell and placed at a small table with metal chairs within the Prisoner Processing area.  This is shown here.



13

Agent Williams had him sign a consent to search form for his carry-on and checked baggage.  The time indicated on the form is **1:38 p.m**.  (**Ex. J**, Consent to Search Form).  Agent Williams also had Mr. Benderoff sign a *Miranda* waiver form.  (**Ex. K,** Statement of Rights Form).  While the *Miranda* form lacks any time notation, defendant believes that form was done at the same time as the consent form because both are signed by agent Williams.  Such a waiver is only required when a subject is questioned while ***in custody***.  *Miranda v. Arizona,* 384 U.S. 436, 444 (1966).

According to a second report authored by SA Williams, he and TFO Presley questioned Mr. Benderoff about the source of the money he had been carrying. (**Ex. L,** Williams Second Report, pp. 2-3).  Mr. Benderoff explained that he had been in Las Vegas for the past several weeks for the purpose of gambling.  *Id.* at 3.  He had gone there with Dr. Gonte and attorney Robert Gross.  *Id.*   He further explained that he brought $1 million to gamble and deposited that money with the Caesars Palace casino.  *Id.*  Mr. Benderoff told agents he was a day trader and professional gambler. He explained the "marker" system at casinos, where money is deposited with the casino and the gambler obtains chips at the table by withdrawing the deposited money using a document called a "marker."   Mr. Benderoff told agents that he got down to $300,000, then back up to about $1.8 million when he cashed out.  *Id.*  This explanation is consistent with the amount of cash in both his and Dr. Gonte's carry-

14

on luggage.  It is also consistent with the numerous casino documents, including markers and vouchers, that were contained in Mr. Benderoff's carry-on bag with the money, which was wrapped in Caesars Casino money wrappers.

Below is a photo of an evidence bag containing the casino records found in Mr. Benderoff's carry-on, along with the money.  Copies of those casino records are attached to this motion as **Exhibit P.**  In the middle (far left) of the evidence bag is one of the yellow Caesars casino money wrappers that bound each of the stacks of $10,000.



The photo below is a copy of two of several casino markers that were found by agents with the money in Mr. Benderoff's carry-on bag.



Along with the casino markers, there were several Caesars Palace Guest Deposit Vouchers, like the one below.  This voucher documents the fact that Brian Benderoff had an available balance at Caesars casino of over $1.5 million as of June 22, 2016, the day before agents detained and interrogated him.

16

CAESARS PALACE LAS VEGAS
GUEST DEPOSIT VOUCHER

Date: 06/22/16  Time: 14:31:59

Patron Name: BENDEROFF, BRIAN        Patron#: 595433          Total Available:    1533,000.00

Deposit Slip #:        0035788        Window:  10      Status:   SFKONLY   Front Money:       4461,000.00

Denominations    Cash Received
$ 1000
$ 500                                    CASH AMOUNT:
$ 100                                    CEQ AMOUNT:
$ 50                                     CHIP AMOUNT:        151,000.00
$ 20                                     PCK AMOUNT:
$ 10                                     OTH AMOUNT:
$ 5                                      TOTAL AMOUNT:       151,000.00
$ 2                                      WRITTEN AMOUNT:
$ 1

WRITTEN AMOUNT : *** ONE HUNDRED FIFTY ONE THOUSAND DOLLARS & 00/CENTS ***

CUSTOMER: _____

CASHIER: _____

---

CAESARS PALACE LAS VEGAS
GUEST DEPOSIT VOUCHER

Date: 06/22/16  Time: 15:44:06

Patron Name: BENDEROFF, BRIAN        Patron#: 595433          Total Available:    1564,000.00

Deposit Slip #:        0035789        Window:  11      Status:   SFKONLY   Front Money:       4592,000.00

Denominations    Cash Received
$ 1000
$ 500                                    CASH AMOUNT:
$ 100                                    CEQ AMOUNT:
$ 50                                     CHIP AMOUNT:        131,000.00
$ 20                                     PCK AMOUNT:
$ 10                                     OTH AMOUNT:
$ 5                                      TOTAL AMOUNT:       131,000.00
$ 2                                      WRITTEN AMOUNT:
$ 1

WRITTEN AMOUNT : *** ONE HUNDRED THIRTY ONE THOUSAND DOLLARS & 00/CENTS ***

CUSTOMER: _____

CASHIER: _____

Mr. Benderoff's statements to agents at 1:38 p.m. about the lawful source of the money (casino winnings), the fact that all of the money was wrapped in Caesars casino money wrappers, the gambling markers, and the Caesars Palace Guest Deposit Voucher showing Mr. Benderoff's casino balance exceeding $1.5 million on June 22, 2016, should have ended his detention right then and there. Instead, he was placed back into the locked and freezing cold cell, where he would agonize for the next several hours.

Mr. Benderoff spent the vast majority of the ten and a half hours at the HSI Building locked inside the prisoner cell. On no less than *ten occasions*, Mr. Benderoff *asked to go home* and was told that he would *not be permitted to leave*.

17

(**Ex. A,** ¶ 25).  The agents either flatly refused his request or told him words to the effect of, "we are working on it."  *Id.*  The agents did let Mr. Benderoff out of his cell approximately once per hour for about ten to fifteen minutes. (*Id.* at ¶ 26).  He would be permitted to sit in the larger Prisoner Processing area.  But after each short break, agents would put him back into the cell, causing him much consternation. Mr. Benderoff recalls screaming to be let out of the cell and crying on and off while suffering from debilitating anxiety and claustrophobia.  *Id.*

Mr. Benderoff also recalls that agents told him at various times during his detention that he was in serious trouble and that Dr. Gonte was implicating him in crimes. (*Id.* at ¶ 27).  This was, in fact, untrue, as Dr. Gonte's interview did not implicate Mr. Benderoff in a crime.  (*See* Gonte Interview, **Ex. F**, Williams Report, pp. 3-4).

Agents did not take Mr. Benderoff's cell phone while he was detained, most likely in the hope that he would write incriminating texts or emails which they could view when they took his phone later.  In any event, there was extremely poor cellular service inside the cell.  (**Ex. A,** ¶ 28).   Mr. Benderoff examined his cell phone years after the ordeal and found that he had missed a number of incoming phone calls during his lengthy detention.  These included: 1) five missed calls from his wife Amy between 12:30 p.m. and 8:00 p.m.; 2) seven missed calls from his mother

between 7:02 p.m. and 9:11 p.m.; and 3) one missed call from his sister at 9:16 p.m.
*Id.*

While in the cell, Mr. Benderoff did receive limited text messages. At 5:39 p.m., ostensibly in response to Mr. Benderoff's earlier urgent message from the airport bathroom, attorney Thomas Cranmer sent the following text to Mr. Benderoff's phone:



In the text, Mr. Cranmer tells Mr. Benderoff that he just tried to call his cellphone but that his call went instantly to voicemail. Mr. Benderoff texted back, telling him, **"I'm being detained** [b]y airport homeland security from Las Vegas with a lot of money…**they act like I will be let go…its been 3 hours."** (emphasis added). In

fact, by this time Mr. Benderoff had been detained for over *five* hours.  Mr. Cranmer

responded, stating in pertinent part, "**Hopefully you will be released soon."**  Later,

Mr. Benderoff stated, "**Please help me** I'd **[if] I don't get out."**



These text exchanges, sent in real time with Mr. Benderoff's detention, make clear

that, as of 5:39 p.m., Mr. Benderoff was still being detained and in the custody of

federal agents.  It also documents his unmistakable desire to leave.

## 2. Second Interrogation – Time Unknown

It is unknown what time it was when Mr. Benderoff was taken out of his cell

for the second interrogation.  It involved different law enforcement officers, namely,

HSI Special Agents Brian Helmerson and Mark Vaughan.   Agent Helmerson's

report of the second interrogation did not indicate the time.   The two agents

questioned Mr. Benderoff in the Prisoner Processing area at the metal table as before. (**Ex. M,** Helmerson Report, p. 2).

During the interrogation, Agents Helmerson and Vaughan questioned Mr. Benderoff further about the source of the money he was carrying.  Mr. Benderoff again told the agents that he was a professional gambler and added that he had recently won $3 million playing blackjack at the Wynn casino.  *Id.*  Mr. Benderoff shared with agents a voicemail message on his phone from Debbie Nutton, a Senior Vice President at the Wynn, stating that Mr. Benderoff was no longer welcome to play blackjack because of his winnings and because he was considered "an advantaged player."  *Id.*  Mr. Benderoff also told agents that he received some of his funds to gamble from Dr. Gonte and Mr. Gross.  *Id.* at 3.  Mr. Benderoff stated that he had never met with any of the investors that Mr. Gross had obtained funds from and did not know the terms of the investment between them and Mr. Gross.  *Id.* Following this second interrogation, Mr. Benderoff was once again placed back into his cell.

### 3.  Agent Helmerson Calls Mr. Benderoff's Wife – 5:30 p.m.

At approximately 5:30 p.m., Mr. Benderoff was taken out of his cell by agent Helmerson for the purpose of calling Amy Mosher, Mr. Benderoff's wife.  Mr. Benderoff listened to the conversation as the agent made the call.  Agent Helmerson told Ms. Mosher, "we have your husband," and he was, "stopped with a lot of

money." (**Ex. N**, Mosher Dec., ¶¶ 4-5).  Ms. Mosher confirmed that her husband had been in Las Vegas on a gambling trip and that she had provided Mr. Benderoff with between $225,000 to $300,000 to gamble with.  Agent Helmerson made a comment to the effect of, "that's not enough," and ended the call. (*Id.* ¶ 5).  Ms. Mosher understood her husband to be under arrest at the time of the call based on the fact that the agent called her, rather than Mr. Benderoff, and that the agent stated, "We have your husband."  (*Id.* ¶ 6).

Mr. Benderoff was placed back into his locked cell.  Agent Helmerson did not include this call to Mr. Benderoff's wife in any of his reports.  The approximate time of the call is gleaned from a text message that Ms. Mosher tried to send her husband at 5:45 p.m. following the call from Agent Helmerson.  (*Id.* ¶ 4).

## 4.  <u>Third Interrogation (Time Unknown) – Agents Bargain to Release Mr. Benderoff In Exchange for Information</u>

The third interrogation of Mr. Benderoff is reflected in agent Helmerson's report.  This time, the agents questioning him were Helmerson, Desmarets and Deaven. (**Ex. M,** p. 3).  Prior to questioning, agents allowed Mr. Benderoff to step outside of the building into the back parking lot.  *Id.*  Mr. Benderoff then provided the names Myron Rubin, Clayton Jerris and Bradley Jerris, as individuals who provided funds to Mr. Gross.  *Id.*

Agent Helmerson's report describes, rather candidly, a bargain reached between the agents and Mr. Benderoff, who was desperately seeking to be released from their custody.  The report reads:

> On **several occasions** BENDEROFF stated he would **provide the agents with truthful statements if he was allowed to return home** that evening.  **Agents agreed to his request**.

*Id.* (emphasis added).  Not only does the report make clear that Mr. Benderoff was not free to leave the agents' custody, it also documents the fact that Mr. Benderoff had been asking for his release "[o]n several occasions."  The strikingly candid report also documents the powerful *leverage* agents were using to extract statements by Mr. Benderoff.  His freedom in exchange for his statements.  And they knew (or should have known) from their observations of Mr. Benderoff and his disclosure of his anxiety disorder and claustrophobia just how strong their leverage was.

Agent Helmerson's report is consistent with the recollections of Mr. Benderoff.  He recalls telling agents on multiple occasions that he would provide information to them if they would agree to release him.  Specifically, he recalls agent Helmerson at one point agreeing to release him if he provided the agents with "something good."  (**Ex. A, ¶** 27).  Mr. Benderoff understood that to mean that he had to provide information to agents that was sufficient to satisfy them in order secure his release; otherwise he would remain in their custody indefinitely. *Id.* According to his psychiatrist, given his anxiety disorder and claustrophobia, Mr.

Benderoff would have done virtually anything to get out of the situation.  (**Ex. I,** Dr. Soverinsky Dec., ¶ 5).

The information provided by Mr. Benderoff at this time was not sufficient to secure his release.  He was placed back into his cell.  His next and last interrogation would occur at about 11:00 p.m.

### 5. <u>Fourth Interrogation – 11:00 p.m.</u>

The final time agents allowed Mr. Benderoff out of his cell was for his fourth interrogation.  According to both Helmerson's report and Mr. Benderoff, this last interrogation was precipitated by a request from Mr. Benderoff to talk to agent Helmerson. **(Ex. M,** p. 3; **Ex. A**, ¶ 30).  The agents involved this time were Helmerson and Deaven only.  (**Ex. M,** p. 3).  According to agent Helmerson's report, at the conclusion of this final round of questioning, Mr. Benderoff signed a consent to search form for his cell phone, iPad and email.  (**Ex. O,** Consent to Search Form).  The time on the consent form is 11:30 p.m.  *Id.*  It is believed, therefore, that the final interrogation occurred at about 11:00 p.m.

Mr. Benderoff was desperate to be released from custody after eleven hours of detention.  He was feeling suicidal and that his life depended upon providing information sufficient to cause agent Helmerson to agree to release him.  (**Ex. A,** ¶ 30).  It is for that reason, and that reason alone, that he provided self-incriminating information in the hope it would satisfy the agents enough to obtain his release.  *Id.*

Mr. Benderoff, for the first time, told agents about a seven-year-old insurance fraud scheme involving Dr. Gonte and Owner A from the indictment. Mr. Benderoff implicated himself in that scheme, which was heretofore unknown to law enforcement and with which Mr. Benderoff was later charged in this case.

More specifically, Mr. Benderoff told agents how Dr. Gonte fraudulently assisted Owner A, who was having financial difficulties and needed to sell $65 million in insurance policies that Owner A had taken out on his mother's life. Dr. Gonte helped Owner A sell the policies by providing fraudulent blood tests using blood from a diabetic patient, rather than Owner A's mother's blood. That reduced Owner A's mother's life expectancy as reflected on her life expectancy report, which in turn helped fraudulently sell the polices to five different investment companies for millions of dollars. (**Ex. M,** p. 5).

The *sole* reason Mr. Benderoff told agents about Owner A's insurance fraud scheme with Dr. Gonte (which directly implicated Mr. Benderoff) was to obtain his release from their custody. (**Ex. A,** ¶ 30). Mr. Benderoff's disclosures finally satisfied the agents, who agreed to release Mr. Benderoff. Sometime after 11:00 p.m., agent Helmerson called Mr. Benderoff's wife for a second time. He told her that he was releasing Mr. Benderoff and that she could pick him up at a location near the airport. (**Ex. N,** ¶ 8). The fact that the agents finally agreed to let Mr. Benderoff go after his *fourth* interrogation is memorialized in agent Helmerson's report. He

25

wrote, "It should be noted BENDEROFF was *permitted to leave* the HSI office on his own free will later this evening."  (**Ex. M,** p. 3) (emphasis added).  Sometime later, Amy Mosher arrived and took Mr. Benderoff home.  Agents kept his iPhone and iPad, which they later searched.

According to Amy Mosher, when she arrived at the HSI building to pick up her husband, agents walked him and Dr. Gonte out to her car.  When the agents reached her car, agent Helmerson made a derogatory remark, stating that he was "glad to be rid of these two [homosexual slur]'s."  (**Ex. N,** ¶ 9).  Helmerson added that he did not know how Ms. Mosher could put up with her husband. *Id.*  Upon seeing Mr. Benderoff, Ms. Mosher made these observations:

> My husband did not look well when he entered my car.  I have seen him in nervous/anxious states on multiple occasions. **He appeared exhausted and emotionally distressed to a degree more severe than I was accustomed to observing**.  Based on his appearance and demeanor, I was concerned for his physical and mental well-being.

(*Id.,* ¶ 10) (emphasis added).

Not a single second of the eleven hours of Mr. Benderoff's detention was audio or video recorded by law enforcement.  That includes all four interrogations.

## III.   APPLICABLE LAW

### A.  <u>Fourth Amendment</u>

Under the Fourth Amendment to our Constitution, every search or seizure by a government agent must be reasonable.  *See* U.S. CONST. amend. IV.  Generally, searches and seizures by government actors are presumed unreasonable and invalid unless they are based on probable cause *and* executed pursuant to a warrant. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013).  However, certain kinds of searches and seizures are valid when they constitute recognized exceptions to the warrant requirement, such as arrests in public upon probable cause and investigatory stops first recognized by *Terry v. Ohio,* 392 U.S. 1 (1968).

### 1.  <u>"Seizure" Defined</u>

A person is "seized," and entitled to the protections of the Fourth Amendment, when a reasonable person would not feel (1) "free to leave" or (2) "free to decline the officers' requests or otherwise terminate the encounter."  *Brendlin v. California*, 551 U.S. 249, 255 (2007).  This includes when an officer, "by means of physical force or *show of authority"* terminates or restrains a person's freedom of movement. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry,* 392 U.S. at 19, n. 16) (emphasis added).

The standard for determining whether a "seizure" occurred for Fourth Amendment purposes originated from the test devised by Justice Stewart in *United*

*States. v. Mendenhall*, 446 U.S. 544 (1980), where he wrote that a seizure occurs if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id* at 554.

### 2. __Warrantless ''Arrest on Probable Cause__

While an arrest is a "seizure" under the Fourth Amendment, a warrant is not constitutionally required for an arrest where an officer has probable cause and the arrestee is in a public place. *United States v. Watson*, 423 U.S. 411, 421-24 (1976).

### 3. __Investigatory Stop, aka, *Terry* Stop__

In *Terry*, the Supreme Court "created only limited exceptions to the general rule that seizures of the person require probable cause to arrest." *Florida v. Royer*, 460 U.S. 491, 499 (1983). In *Terry*, the Court held that a brief investigatory stop may be conducted where an officer has reasonable suspicion that an individual is engaged in criminal activity. *Terry*, 392 U.S. at 21. Reasonable suspicion, a lesser standard than probable cause, exists when an officer can "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Id.* Reasonable suspicion cannot be based on an officer's "inchoate and unparticularized suspicion or 'hunch.'" *Id.* at 27. Moreover, a person "may not be detained even momentarily without reasonable, objective grounds for doing so …" *Royer*, 460 U.S. at 498.

The scope of a detention based on less than probable cause "must be carefully tailored to its underlying justification." *Id.* at 500. "In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person... Nor may the police seek to verify their suspicions by means that approach the conditions of arrest." *Id.* at 499. "[R]easonable suspicion of a crime is insufficient to justify custodial interrogation even though the interrogation is investigative." *Id.*

"[A]n investigatory detention *must be temporary* and last no longer than is necessary to effectuate the purpose of the stop." *Id.* at 500. The law enforcement officer must "verify or dispel the officer's suspicion in a short period of time." *Id.* at 500. It is the government's "burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently *limited in scope and duration* to satisfy the conditions of an investigative seizure." *Id.* (emphasis added).

A detention that exceeds the limited scope of an investigatory *Terry* stop, "whether or not it is technically characterized as an arrest, must be supported by probable cause." *Dunaway v. New York,* 442 U.S. 200, 214 (1979).

### 4. <u>Consent</u>

The Fourth Amendment does not apply to consensual encounters with government agents where the individual gives valid consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 220 (1973). Thus, a person can consent to speaking with

law enforcement or agree to accompany them to another location for an interview. However, the government "has the burden of proving that the necessary consent was obtained and that is was freely and voluntarily given, a burden that is *not satisfied by showing a mere submission to a claim of lawful authority*." *Royer,* 460 U.S. at 497.

The government must prove that the consent was voluntary and unequivocal. *United States v. Buckingham,* 433 F.d 3d 508, 512 (6th Cir. 2006). This requires proof by "clear and positive testimony" that the consent was voluntarily given. *United States v. Worley,* 193 F.3d 380, 385-86 (6th Cir. 1999).

A basic axiom in Fourth Amendment jurisprudence on consent is the fact that "the consenting party … at any moment may retract his consent." *Painter v. Robinson,* 185 F.3d 557, 567 (6th Cir. 1999).

When a defendant consents to a search of his belongings at a time he is being illegally detained, the consent is deemed tainted by the illegality of the detention and the consent is invalid. *See Royer,* 460 U.S. at 507-08 (defendant's consent at airport to search luggage invalid because he was being illegally detained at time consent given).

### 5. <u>Exclusionary Rule/ Fruit of the Poisonous Tree</u>

"[S]tatements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention …" *Royer,*

460 U.S. at 501 (citing *Dunaway,* 442 U.S. at 218-219).  This was "the principal

holding" of *Wong Sun v. United States,* 371 U.S. 471 (1963).  *Royer* at 501.

This does not mean, however, that all evidence is inadmissible simply because

it would not have come to light but for the existence of an illegal detention.  The

question is whether, following an illegal detention or arrest, "the evidence … has

been come at by *exploitation of that illegality* or instead by means sufficiently

distinguishable to be purged of the primary taint."  *Brown v. Illinois,* 422 U.S. 590,

599 (1975) (internal citations omitted) (emphasis added).

For example, in *Wong Sun,* the defendant was the subject of an illegal arrest

in violation of his Fourth Amendment rights.   Following his illegal arrest, Wong

Sun was arraigned on charges and released on his own recognizance.  Several days

later, on his own initiative, Wong Sun voluntarily visited the police station and gave

a statement confessing to the crime.  The Supreme Court allowed the confession,

reasoning that Wong Sun's voluntary return to the police station several days after

his illegal arrest caused the connection between the unlawful arrest and his

confession to "become so attenuated as to dissipate the taint" of the Fourth

Amendment violation.  *Wong Sun,* 371 U.S. at 487-488.

The fact that a defendant who is illegally detained or arrested is given his

*Miranda* warnings and voluntarily waives them is not in itself sufficient to "dissipate

the taint" of the illegal arrest.  *Brown,* 422 U.S. at 603.  In order to determine if the

confession is the result of the "exploitation of an illegal arrest," courts must examine: 1) the temporal proximity between the illegal arrest and the confession; 2) the presence of intervening circumstances; and 3) "particularly, the purpose and flagrancy of the official misconduct …" *Id* at 603-04.

In order for the government to use a statement of a defendant who is the subject of an unlawful arrest, it "must show not only that the statements meet the Fifth Amendment voluntariness standard, but also that the causal connection between the statements and the illegal arrest is broken sufficiently to "purge the primary taint" of the illegal arrest. *Id.* at 602.

## B. <u>Fifth Amendment</u>

Under the Supreme Court's well-settled *Miranda v. Arizona* decision, the Fifth Amendment's right against self-incrimination dictates that a custodial interrogation may only occur when the defendant is informed of his rights and knowingly waives them. 384 U.S. 436, 444 (1966). If statements are made by a defendant who did not waive his Miranda rights "voluntarily, knowingly and intelligently," the statements must be suppressed. *United States v. Lawrence*, 735 F.3d 385, 436 (6th Cir. 2013). Moreover, the government bears the burden of establishing that a defendant knowingly, voluntarily, and intelligently waived his Miranda rights. *Miranda*, 384 U.S. at 475.

32

If "a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). Ultimately, a determination of whether a statement was voluntary looks to the totality of the circumstances. *United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009).

## IV.   ARGUMENT

### A.   <u>Mr. Benderoff Was Unlawfully Detained Without Reasonable Suspicion When He Was Met by Law Enforcement Officers at His Gate</u>

Mr. Benderoff was unlawfully detained from the moment he was directed to approach government agents at his gate because he did not voluntarily consent and agents lacked the requisite reasonable suspicion to temporarily detain him.

### 1.   <u>Mr. Benderoff Did Not Consent to Going with the Officers</u>

Because consensual encounters are not subject to Fourth Amendment protection, it is important at the outset for this Court to determine whether Mr. Benderoff initially consented to going with the four government agents who met him at his gate, or was temporarily detained.

An individual is seized when an officer "by means of physical force or show of authority, has in some way restrained [his] liberty." *Terry,* 392 U.S. at 19, n.16. The inquiry for this Court is, in view of "all of the circumstances surrounding the encounter, [whether] the police conduct would have communicated to a reasonable

person that he was not at liberty to ignore the police presence and go about his business." *Bostick,* 501 U.S. at 437 (internal quotations omitted).  An examination of the totality of the circumstances demonstrates Mr. Benderoff's acquiescence to walk from the gate with the officers was not voluntary or consensual.

Mr. Benderoff's first observation when he walked off the plane into the gate area was seeing four armed law enforcement officers with a police dog about 30 feet from him.  TFO Johansen looked directly at Mr. Benderoff and used his finger to call him over to the officers.   Mr. Benderoff, as would any reasonable person faced with such a show of authority, did not believe he had the choice to ignore the officers and go on his way.  He followed TFO Johansen's command and walked over to them.  The first thing TFO Johansen did was confirm Mr. Benderoff's identity and direct him to produce his identification.  Mr. Benderoff complied.  TFO Johansen then stated, "We need to speak with you" and Mr. Benderoff said, "okay."

SA Williams' report states that TFO Johansen asked if officers could speak with him and Mr. Benderoff agreed.  There is no mention in the report of officers informing Mr. Benderoff that he was free to decline their request and go on his way.

The government bears "the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, **a burden that is not satisfied by showing a mere submission to a claim of lawful authority**." *Royer,* 460 U.S. at 497 (emphasis added).   In light of all of the circumstances, Mr. Benderoff saying,

"okay" when TFO Johansen told him "we need to speak with you," was a submission to TFO Johansen's claim of authority rather than actual consent. *See United States v. Bowman,* 884 F.3d 200, 211 (4th Cir. 2018) (defendant's response "okay" when officer told him he was going to ask him questions was mere submission to authority); *United States v. Weidul,* 325 F.3d 50, 54 (1st Cir. 2003) (consent not voluntary where individual simply acquiesced to authority by responding "okay" as officer walked into room); *United States v. Ruiz-Estrella,* 481 F.2d 723, 728 (2d Cir. 1973) (consent not voluntary where uniformed officer led defendant away from airport boarding gate into private room and defendant was not informed of his right to refuse).

In *United States v. Beauchamp*, 659 F.3d 560 (6th Cir. 2011), the Sixth Circuit observed:

> [J]ust as when an officer follows someone and stops to 'ask' for identification, or to 'ask' him to exit his vehicle … [a person's encounter with an officer] does not lose its coercive character simply because [the officer] … 'asked' for [the person's] compliance as opposed to 'ordering it.  Such a distinction is purely semantic.

*Id.* at 569.  In *Beauchamp,* the Court found the defendant's consent to a search was not voluntary when he was not informed of his right to refuse and he responded "yes," to the officer's request only after another officer had arrived on the scene and was about to conduct a frisk.  *Id.*

Just as in *Beauchamp*, Mr. Benderoff's statement of "okay," when told the officers needed to speak with him was simply semantical.   He did not really believe he was choosing of his own free will to spend time with the officers rather than proceeding on his way.   To think a reasonable person in Mr. Benderoff's position would have believed he had a choice to say 'no' is to ignore the fact that four armed officers with a canine intercepted Mr. Benderoff right after he disembarked his plane and immediately called him over to them.

Further supporting this is the fact that, as in *Beauchamp*, TFO Johansen never told Mr. Benderoff he could refuse to talk to or go with the officers, and there was mention of him doing so in any report.  *See also Dunaway,* 442 U.S. at 212 (that defendant was never told he was free to go cuts against finding of consent).

Certainly, the government cannot meet their burden of proving by "clear and positive testimony" that Mr. Benderoff's consent to accompany the officers at his gate was voluntarily given.  *Worley,* 193 F.3d at 385-86.

If there were any question as to whether Mr. Benderoff was not free to ignore the officers and go on his way, that question quickly evaporated as officers began exercising control over his movements.   As Mr. Benderoff was walked from the gate, he was flanked by TFO Johansen and another officer.   Not surprisingly, he felt the need to ask permission to use the restroom, permission that was initially denied by TFO Johansen.   And when (as agent Williams writes in his report) officers

36

"**allowed**" Mr. Benderoff to use the bathroom, he was followed inside by TFO Presley, who stood guard just outside of Mr. Benderoff's stall and urged him to hurry up.

The control of Mr. Benderoff's movements continued when the officers took him to the baggage claim so that they could take control of his checked bags. Officers refused to allow Mr. Benderoff to make contact with his Metro Cars driver Michael Jaworski.  Instead, they told Mr. Jaworski to leave the area and informed him that Mr. Benderoff, "was not going anywhere."

In sum, the totality of the circumstances demonstrates that Mr. Benderoff, "was not at liberty to ignore the police presence and go about his business." *Bostick,* 501 U.S. at 437.   And the government cannot meet its burden of proving Mr. Benderoff was freely and voluntarily consenting, rather than "**mere**[ly] **submi[tting] to a claim of lawful authority**.*" Royer,* 460 U.S. at 497.   Mr.  Benderoff was, therefore, "detained" from his initial contact with agents at the gate and his detention must be supported by reasonable suspicion in order to comply with the Fourth Amendment.

2. <u>**There Was No Reasonable, Articulable Suspicion; therefore Mr. Benderoff's Initial Detention Was Unlawful**</u>

Reasonable suspicion is a commonsense standard "that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men,

not legal technicians, act." *Ornelas v. United States,* 517 U.S. 690, 695 (1996).  To justify a *Terry* stop, an officer must have articulable facts to point to that makes his suspicion reasonable.  *Terry*, 392 U.S. at 27.   At bar, the only facts known to TFO Johansen and the agents of Homeland Security who met Mr. Benderoff *en force* at his gate were these:

a. Someone *other than Mr. Benderoff* was traveling with between $200,000 to $250,000 in cash;

b. The money was not "artfully concealed, just laying in [Dr. Gonte's] bag;"

c. Dr. Gonte told TSA Officer King at the Las Vegas airport that he had won the money at a casino;

d. Dr. Gonte was leaving from Las Vegas, a city where people go to gamble;

e. Mr. Benderoff was traveling with Dr. Gonte, the person with the money; and

f. Mr. Benderoff appeared nervous.

(**Ex. D,** HSI Tip Line Report; **Ex. C,** TSA Blotter**; Ex. F,** Williams Report, p. 3).

An initial question screams out as one begins analyzing reasonable suspicion for a *Terry* stop of Mr. Benderoff:  *What crime were the agents investigating?*  Did they suspect the money carried by Dr. Gonte was the proceeds of drug trafficking?  Money laundering?  Some other unknown illegal scheme?  Neither the initial Tip Line Report nor *any* subsequent report by agents mentions a specific suspected crime under investigation.  This speaks volumes on the *lack of reasonable, articulable suspicion.*  A crime was never articulated because the agents did not have one to

articulate.  The truth is, what the agents had when they detained Mr. Benderoff was an "inchoate and unparticularized suspicion or hunch," something the United States Supreme Court has specifically *rejected* as a justification for an investigatory stop. *Reid v. Georgia*, 448 U.S. 438, 441 (1980).

In *Reid*, the Supreme Court denied the government's justification for an investigative stop of a defendant walking through an airport.  There, the facts were stronger for temporary detention than those at bar.  The defendant matched a drug courier profile, his flight arrived from a city known to be the origin of illegal narcotics, he arrived early in the morning when there was minimal police presence, he had no suitcase, he was acting nervous, and he was attempting to distance himself from his traveling companion.  Still, the high court found those facts "simply too slender a reed to support" reasonable suspicion.  *Reid*, 448 U.S. at 441.

Here, the facts are not even as strong as those held insufficient in *Reid*.  It is unquestionably legal to carry large sums of cash, even $880,000, on a domestic flight.  Moreover, Mr. Benderoff was not even the person authorities believed to be carrying the cash.  He was merely the travel companion of Dr. Gonte.  Dr. Gonte reported that the money was gambling winnings to the TSA in Las Vegas, a city where people travel to gamble.  Moreover, Mr. Benderoff did not do anything to act suspicious as the defendant did in Reid, in that he did not try to hide the fact that he

was traveling with Dr. Gonte.  If the facts in *Reid* found insufficient to justify a stop constituted "a slender reed," those here amount to less than a seedling.

The federal courts of appeals, including the Sixth Circuit, have rejected government claims of reasonable suspicion on facts stronger than those in this case. *See Family Service Assoc. v. Wells Township,* 783 F.3d 600, 604 (6th Cir. 2015) (no reasonable suspicion to stop  where suspect never committed any crime, was sitting on a guardrail late at night in a high crime area, and walked away from officer without answering his questions); *United States v. Uribe,* 709 F.3d 646, 652-53 (7th Cir. 2013) (no reasonable suspicion to stop out-of-state vehicle traveling late at night when its color did not match color indicated on vehicle registration); *United States v. Brown,* 925 F.3d 1150, 1153 (9th Cir. 2019) (no reasonable suspicion to stop defendant who fled upon police activation of patrol car lights); *United States v. Bowman*, 884 F.3d 200, 218 (4th Cir. 2018) (no reasonable suspicion to prolong traffic stop when defendant appeared nervous and failed to answer questions about his driving route);  *United States v. Neff,* 681 F.3d 1134, 1141-42 (10th Cir. 2012) (no reasonable suspicion to stop car that pulled off highway right before drug checkpoint when defendant appeared surprised and tried to turn the other way upon seeing officer); *United States v. Delaney,* 955 F.3d 1077, 1086-87 (D.C. Cir. 2020) (no reasonable suspicion to stop defendant kissing passenger after midnight in parked vehicle in close proximity to gunshots).

Regardless of the level of suspicion that the discovery of cash in Dr. Gonte's carry-on provided, that suspicion does not carry over to Mr. Benderoff.  The Supreme Court rejected this "guilt by association" reasoning for reasonable suspicion in *Ybarra v. Illinois,* 444 U.S. 85, 93-94 (1979).  There, the Court held that, even though officers had a search warrant and probable cause to search a tavern and its bartender for narcotics, there was no reasonable suspicion to frisk a patron who happened to be at the tavern during the search.  The Court held that there was *no individualized suspicion* as to the patron frisked.  *Id.* at 93-94.  The same is true here; even if this Court finds reasonable suspicion existed to temporarily detain Dr. Gonte, there was no individualized suspicion as to Mr. Benderoff.

Finally, to the extent that the government relies on Mr. Benderoff's nervousness to support reasonable suspicion, courts have recognized that "[n]ervousness is a common and entirely natural reaction to police presence." *United States v. McKoy,* 428 F.3d 48, 40 (1st Cir. 2005).  Indeed, "most everyone is nervous when interacting with the police." *United States v. Palmer,* 820 F.3d 640 (4th Cir. 2016).  And, as explained in the declaration of Dr. Soverinsky, Mr. Benderoff suffers from Severe Generalized Anxiety Disorder.

Mr. Benderoff's illegal detention at the airport gate and baggage area was only the beginning of the agents' continued violations of his Fourth Amendment rights, violations that would persist until he was finally released eleven hours later.

**B. Mr. Benderoff Was Unlawfully Arrested Without Probable Cause When He Was Taken To the HSI Building and Confined in a Prisoner Cell For Over Ten Hours**

Even had agents possessed reasonable suspicion for a brief investigatory stop, "further detention or search must be based on consent or probable cause." *United States v. Brignoni-Ponce,* 422 U.S. 873, 881-82 (1975).  Once Mr. Benderoff was transported from the airport to the HSI Building and placed in a cell, his custody status increased from temporary detention to arrest. *See Dunaway,* 442 U.S. at 212 (temporary detention elevated to arrest requiring probable cause where suspect not questioned where found but transported to police station).  Thus, agents needed either consent or probable cause to take him to and keep at the HSI Building.  They lacked both.

**1. Mr. Benderoff Was Under Arrest and *Did Not Consent* to Be Present at the HSI Building**

There can be no doubt whatever that Mr. Benderoff was in custody and did not consent to spending his day suffering for ten and a half hours in a prisoner cell that terrified him.  If there were any ambiguity, it is cleared up by several powerful pieces of evidence.

- Agent Helmerson's report acknowledges that Mr. Benderoff requested on "several occasions" to be released to go home in exchange for providing information to the agents.  Helmerson wrote that Mr. Benderoff "was permitted to leave the HSI office on his own free will" after he provided the incriminating statements. **(Ex. M,** Helmerson Report, p. 3).

- Mr. Benderoff's contemporaneous texts with his attorney Tom Cranmer at 5:39 p.m.: "**I am being detained [b]y homeland security**." Mr. Cranmer's response: "Hopefully you will be released soon."  And Mr. Benderoff's reply: "**Please help me [if] I don't get out**."

- The nature of the detention itself, and the fact that someone who suffers from Severe Generalized Anxiety Disorder and claustrophobia would not agree to be detained in a locked 8x6 prisoner cell for any length of time, let alone ten and a half hours.  (**Ex. I,** Dr. Soverinsky Dec. ¶ 6).

- Agent Helmerson's statement to Mr. Benderoff's wife, "We have your husband."

- Mr. Benderoff's repeated pleas to agents to let him go home.

- The fact that agents tightly controlled Mr. Benderoff's movements while at the HSI building.  They determined when to let Mr. Benderoff out of his cell, when to move him to the interview table for one of his four interrogations, and when to allow him to step outside of the building to get fresh air.  They also determined when to release him to his wife and physically walked Mr. Benderoff to her car.

- Agent Helmerson's decision to release Mr. Benderoff at 11:30 p.m. after he provided incriminating statements regarding the fraud with which he is currently charged.

- The characterization that the Detroit agents likely made to the Las Vegas authorities, including Nevada Gaming Control agent Sibbert, who wrote a contemporaneous email correctly stating, "We got word that Brian Benderoff … [has] been detained at the Detroit Airport …"

- Agent Helmerson's call to Amy Mosher sometime after 11:00 p.m. to tell her he was releasing her husband and she could come pick him up.  (**Ex. N,** Mosher Dec. ¶ 8).

43

Lacking consent, in order to have lawfully held Mr. Benderoff under arrest at the HSI Building, the Fourth Amendment required that government agents had probable cause, something they sorely lacked.

## 2. Any "Consent" Was Withdrawn by Mr. Benderoff

Although it is clear that Mr. Benderoff did not consent to go to the HSI Building or to be caged in a small cell, even if he had initially consented, that consent was withdrawn by the first interrogation, which happened at approximately 1:38 p.m. Thus, the government's actions of continuing to hold him in custody, hour after hour, were nonetheless unconstitutional. This is because Mr. Benderoff had the absolute right to retract his consent "at any moment." And agents were constitutionally required to honor his retraction. *Painter*, 185 F.3d at 567.

Mr. Benderoff objected vociferously to being placed into the cell at the outset, which was shortly before his first interrogation at 1:38 p.m. (**Ex. A, ¶** 21**)**. And he pleaded with agents to release him on no less than ten separate occasions during his ten and a half hours in custody at the HSI building. (*Id.* ¶ 25). His multiple attempts to leave the agents' custody is documented in agent Helmerson's report, in which he wrote, "**On several occasions** BENDEROFF stated he would provide the agents with truthful statements **if he was allowed to return home** …" (**Ex. M,** p.3) (emphasis added).

3. **There Was No Probable Cause and None Was Developed**

As discussed above, agents lacked reasonable suspicion to initially detain Mr. Benderoff. They also lacked probable cause to arrest him and continue the unlawful detention. This is true even after they opened Mr. Benderoff's carry-on and found the $880,000 in cash, which was wrapped in Caesars casino money wrappers and accompanied by corresponding casino documentation. There is nothing illegal in carrying large sums of cash obtained from a Las Vegas casino.

To the extent that the government might claim in their response that probable cause was developed from other sources while Mr. Benderoff languished in custody, such a claim would lack merit. According to agent Williams' report, TFOs Johansen and Adamisin questioned Dr. Gonte at the HSI Building at 2:45 p.m. Dr. Gonte confirmed Mr. Benderoff was a professional gambler and that the money they each carried was related the gambling trip. Dr. Gonte told agents that Mr. Gross arranged for people to loan money that was used by Mr. Benderoff to gamble in Las Vegas. But Dr. Gonte did not implicate Mr. Benderoff in any crime. (**Ex. F,** Williams Report, pp. 3-4).

Mr. Gross was first questioned by agents when he came to the HSI Building at 8:16 p.m. (**Ex. Q,** Vaughan Report, p.2). Mr. Gross confirmed the three-week gambling trip in Las Vegas with Mr. Benderoff and Dr. Gonte. The questioning of Mr. Gross by agent Vaughan and TFO Presley lasted until 1:14 a.m. the following

morning.  *Id.* at 9.  At 9:07 p.m., agents read Mr. Gross his *Miranda* rights. *Id.* at 5.

It was not until 11:55 p.m. that Mr. Gross made mention of anything potentially

illegal when he told agents that identical deeds were provided to multiple investors

as collateral for their investments.  *Id.* at 8.  By this time, however, Mr. Benderoff

had already made his incriminating statements and had been released from the

custody of Homeland Security.

Thus, even given the information provided by Dr. Gonte and Mr. Gross,

agents never developed probable cause during Mr. Benderoff's ten and a half hours

in the custody of federal agents.  And to this day, almost six years later, there remains

no probable cause that Brian Benderoff was doing anything illegal by carrying

money from his casino winnings on the Delta flight from Las Vegas.[4]

### C. Mr. Benderoff's Statements Were the Product of His Unlawful Arrest and Therefore Must Be Suppressed

"[S]tatements given during a period of illegal detention are inadmissible even

though voluntarily given if they are the product of the illegal detention …"  *Royer,*

*supra,* at 501.  There can be no doubt here that Mr. Benderoff's incriminating

statements at 11:00 p.m. where the product of his illegal detention.  The surprising

---

[4] It is worth noting that agents had no information suggesting that Mr. Benderoff was connected to drug trafficking.  And, while money launderers have been known to use casinos to launder illicit proceeds, they do not spend three weeks gambling with that money; rather, they deposit large sums, gamble briefly with a small part of it (enough to justify their deposit), then withdraw it all to "wash" it.  Here, Mr. Benderoff's casino documentation is inconsistent with money laundering, as it demonstrated his extensive gambling over the weeks he was in Las Vegas.

fact in this case is that agent Helmerson *memorialized* this in his report when he wrote that Mr. Benderoff offered on several occasions to provide statements if agents would agree to release him from his illegal detention. **(Ex. M,** p. 3). As soon as Mr. Benderoff gave his incriminating statement during his *fourth* interrogation (after 10 and a half hours of being illegally detained), he was released by agents. The *only* reason Mr. Benderoff provided the statement about the fraudulent sale of insurance policies was to get free from his illegal and mentally anguishing captivity. **(Ex. A,** ¶ 30).

It should be noted that, unlike the defendant in *Wong Sun,* there was no intervening event that occurred during Mr. Benderoff's odyssey of illegal detention that could have potentially "purged the taint" of the illegal arrest.

And the fact that he was given *Miranda* warnings at 1:38 p.m. that day is unavailing to the government. The fact that a defendant who is illegally detained is given his *Miranda* warnings and voluntarily waives them is not in itself sufficient to "dissipate the taint" of the illegal arrest. *Brown,* 422 U.S. at 603. In order to determine if the confession is the result of the "exploitation of an illegal arrest," courts must examine: 1) the temporal proximity between the illegal arrest and the confession; 2) the presence of intervening circumstances; and 3) "particularly, the purpose and flagrancy of the official misconduct …" *Id.* at 603-04.

In *United States v. Shaw*, 464 F.3d 615 (6th Cir. 2006), the Sixth Circuit determined that statements made by the defendant while in custody were not "sufficiently voluntary" to overcome the taint of the government's illegal arrest, despite the defendant *twice* signing a *Miranda* waiver form. The Sixth Circuit rejected the government's contention that the defendant "voluntarily" escorted officers to the police station where he was never informed that he was "free to go." *Id.* at 623. And because the police officers did not have probable cause to detain the defendant, his confession obtained after the illegal arrest (albeit after two *Miranda* waivers), was tainted by the unlawful arrest, and was required to be suppressed. *See also United States v. Watson*, 489 F. App'x 922, 926 (6th Cir. 2012) ("Because the entry into the home violated the Fourth Amendment, Watson's subsequent arrest was unlawful, and his post-arrest statements that flowed from the unlawful arrest are fruit of the poisonous tree and subject to the exclusionary rule.").

Here, applying the Supreme Court's test in *Brown,* there was no buffer of time between his unlawful detention and his statement. Mr. Benderoff gave his statement *while* being unlawfully detained and *for the express purpose* of ending his illegal arrest. In addition, the official misconduct was flagrant in that it was severe in its length and location (the small prisoner cell) and resulted in emotionally torturing Mr. Benderoff, who had a preexisting anxiety disorder which he revealed to agents early in his day of custody when he was first placed against his will in the prisoner

cell. Indeed, agents leveraged Mr. Benderoff's mental anguish to extract his incriminating statements during his fourth interrogation.

In sum, the government cannot meet its burden of demonstrating that the causal connection between the statements and the illegal arrest is broken sufficiently to "purge the primary taint" of the illegal arrest. *Brown*, *supra*, at 602. Mr. Benderoff's statements to agent Helmerson regarding the sale of Owner A's mother's life insurance policies must, therefore, be suppressed.

### D. <u>Mr. Benderoff's Statements Were Not Voluntary, and Therefore Must Be Suppressed</u>

Mr. Benderoff's statements are inadmissible at trial based on a wholly independent ground apart from the Fourth Amendment violations; that is because they were obtained by government *coercion* and were involuntarily given, in violation of his Fifth Amendment rights. Generally, involuntary statements made by a defendant may not be admitted against him at trial. *Chavez v. Martinez,* 538 U.S. 760, 770-73 (2003). When a defendant raises a claim of involuntariness, it is the government's burden to prove by a preponderance of the evidence that an incriminating statement was voluntary. *Colorado v. Connelly,* 479 U.S. 157, 167-68 (1986).

To determine whether a defendant's statement was voluntary or involuntary, courts must inquire whether, under the totality of the circumstances, officers obtained the evidence by overbearing the will of the accused. *Haynes v. Washington,*

373 U.S. 503, 513-14 (1963).  A statement is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist. *Ledbetter v. Edwards,* 35 F.3d 1062, 1067 (6th Cir. 1994).  The court's inquiry centers on two things: 1) the conduct of law enforcement officers creating pressure; and 2) the defendant's capacity to resist that pressure.  *Mincey v. Arizona,* 437 U.S. 385, 399-401 (1978).  The defendant's mental health, as well as the length and continuity of the interrogation, are key considerations. *Withrow v Williams,* 507 U.S. 680 (1993).

The inquiry propounded by the Sixth Circuit considers the "totality of the circumstances" and examines whether:

> (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.

*Rutherford*, 555 F.3d at 195.

The U.S. Supreme Court and U.S. Courts of Appeals have excluded incriminating statements by defendants where they found them to be involuntary and the result of police coercion.  *See, e.g., Mincey,* 437 U.S. at 399-401 (confession involuntary because continued police interrogation of hospitalized suspect overwhelmed his free will); *United States v. Taylor,* 745 F.3d 15, 25 (2d Cir. 2014) (statements involuntary because police took undue advantage of sleep-deprived defendant).

Here, agents were aware from the jump that Brian Benderoff is afflicted by extreme anxiety and claustrophobia.  He told agents as much as soon as he was made to go into the locked 8 x 6 prisoner cell over his adamant protestations.  Surely, the agents heard the screams and the crying over the course of ten hours of confinement.  Still, agents put him in the cell and brought him out sparingly, over the course of many hours.  After each of the first three interrogations, the agents indicated by their actions of placing Mr. Benderoff back in the cell that they were not satisfied.  They only agreed to grant his release if he "provide[d] the agents with truthful statements …" (**Ex. M,** p. 3).

Applying the facts to *Mincey's* holding, the agents created the pressure on Mr. Benderoff to confess to a crime by unlawfully confining him in the small cell, his worst nightmare given his anxiety disorder and claustrophobia.  Then, agents teased him with short tastes of freedom, placing him back into the cell when his statements did not satisfy them.  He would sit in the cell and cry and scream.  Per *Mincey*, Mr. Benderoff lacked the capacity to resist the pressure created by the agents.  According to his psychiatrist, Dr. Soverinsky:

> It is my opinion that, if forced to remain in a locked and confined space such as a jail cell for several hours, Mr. Benderoff would be in such a state of anxiousness that he would do virtually anything to get out of the situation, without regard to logic or the consequences to himself.

(**Ex. I, ¶** 5).  Mr. Benderoff candidly describes his mental state at the time he requested to speak to agents to incriminate himself:

51

> By this time [the final interrogation] I was desperate to be released and feeling suicidal.  I do not believe I was thinking rationally.  I remember feeling like my life depended on my release from custody … I knew I was incriminating myself in that scheme, but the only thing that mattered to to me at the time was giving the agents information that would get them to let me go.

(**Ex. A**, ¶ 30).

The Sixth Circuit's test in *Rutherford* likewise compels suppression on involuntariness grounds.  The "police activity" was objectively coercive, the coercion was sufficient to overbear the defendant's will (he had been interrogated three previous times and did not mention the fraud scheme), and the police misconduct (the unlawful detention) was the crucial motiving factor in Mr. Benderoff's decision to incriminate himself.  *Rutherford, supra,* at 195.  As to the last point, getting released from his unlawful detention "was the only reason [Mr. Benderoff] confessed to the 2009/2010 fraud scheme involving Owner A's mother's insurance policies."  (**Ex. A**, ¶ 30).

Agents knowingly leveraged Mr. Benderoff's anxiety disorder and claustrophobia for the sole purpose of obtaining his incriminating statements.  It was the quintessence of a coerced confession.  In any event, the government cannot meet its burden of proving by a preponderance of the evidence that his statements were voluntary.  Mr. Benderoff's statements from June 23, 2016 must be suppressed in accordance with the protections afforded him by the Fifth Amendment.

## V.    CONCLUSION

Based on all of the above, Mr. Benderoff respectfully requests that the Court grant his motion and exclude all evidence, statements and fruits of the poisonous tree obtained as a direct result of his unlawful detention and arrest, including his involuntary, coerced statements.

                              Respectfully submitted

                              /s/ R. Michael Bullotta
                              R. Michael Bullotta
                              P85866 / CA 163401
                              Attorney for Brian Benderoff
                              615 Griswold St., Suite 1620
                              Detroit, MI 48226
                              (313) 400-5776
Dated:  May 25, 2022         michael@bullottalaw.com

## CERTIFICATE OF SERVICE

I, Phillip E. Seltzer, certify that on May 25, 2022, I caused to be filed the foregoing document with the electronic filing system (ECF) of the United States District Court for the Eastern District of Michigan which will notify all attorneys of record of said filing.

                              /s/ Phillip E. Seltzer
                              Phillip E. Seltzer (P34530)