## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

D-2 BRIAN W. BENDEROFF,

        Defendant.

_____/

CASE NO. 20-cr-20380

HON. NANCY G. EDMUNDS

### Government's Response and Brief Opposing
### Defendant's Motion to Suppress Statements (ECF No. 110)

On June 23, 2016, Brian Benderoff voluntarily provided information to federal law enforcement agents—just as he had done countless times before as a long-standing government cooperator, and just as he would continue to do in multiple proffer debriefings in this case.  Benderoff now apparently regrets his decision to cooperate with this investigation.   But because regret is not a basis for suppression, Benderoff instead offers the Court an entirely uncorroborated and incredible story alleging that he was held against his will in a locked prison cell for more than nine hours.  But evidence and witnesses—including other lay witnesses who were also interviewed that same day at the offices of Homeland Security Investigations (HSI)—contradict Benderoff's tale.

Rather than seeing Benderoff in the supposed state of distress he describes in

1

his motion, one lay witness, who saw Benderoff in an open room, remembers him "laughing and having a jovial good time."  Other witnesses similarly remember seeing Benderoff undisturbed and everywhere but in a locked cell on June 23, 2016— including in a conference room, office cubicle, interview rooms, office kitchenette, and even outside.  Benderoff was expressly told he was not under arrest while he was at the HSI offices, was prophylactically advised of his *Miranda* rights, and signed multiple documents making clear that he had not been coerced and that his decision to cooperate with the government's investigation was made voluntarily—even though he now claims the exact opposite.

Benderoff's motion is not rooted in fact and should be denied.

Respectfully submitted,

DAWN N. ISON
United States Attorney

s/Andrew Yahkind
s/Mark Chasteen
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9565
E-Mail: andrew.yahkind@usdoj.gov
E-Mail: mark.chasteen@usdoj.gov

Dated:  July 19, 2022

## Issues Presented

(1) Was Benderoff seized in violation of the Fourth Amendment when he was asked by a plain-clothed officer, in a public concourse of the airport, if he was willing to answer law enforcement's questions and he expressly agreed to do so?

(2) Was Benderoff seized in violation of the Fourth Amendment when he met with law enforcement agents at their offices in open rooms, was expressly told he was not under arrest, was never handcuffed or booked, kept his cellular phone on him, ate pizza in the office kitchenette, and walked outside?

(3) If there was an improper seizure or arrest of Benderoff, did law enforcement, which had probable cause to arrest Benderoff had they chosen to do so, somehow exploit any mistaken police conduct so as trigger application of the exclusionary rule to statements volunteered by Benderoff on a subject matter that he was not being questioned about?

(4) Were Benderoff's volunteered statements made involuntarily when he expressly indicated both that he was making those statements voluntarily and that his cooperation with the government's investigation was not the result of any coercion or intimidation?

## <u>Controlling or Most Appropriate Authority</u>

*Brown v. Illinois*, 422 U.S. 590 (1975)

*California v. Hodari D.*, 499 U.S. 621 (1991)

*Colorado v. Connelly*, 479 U.S. 157 (1986)

*Colorado v. Spring*, 479 U.S. 564 (1987)

*Leadbetter v. Edwards*, 35 F.3d 1062 (6th Cir. 1994)

*Miranda v. Arizona*, 384 U.S. 436 (1966)

*Missouri v. Seibert*, 542 U.S. 600 (2004)

*United States v. Mendenhall*, 446 U.S. 544 (1980)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

D-2 BRIAN W. BENDEROFF,

        Defendant.

_____/

CASE NO. 20-cr-20380

HON. NANCY G. EDMUNDS

### Government's Brief in Support of
### Response to Defendant's Motion to Suppress Statements

For more than two decades, Brian Benderoff, an admitted fraudster, has been voluntarily providing information to federal law enforcement agents about criminal misconduct to help himself.  On June 23, 2016, Benderoff voluntarily traveled to the offices of Homeland Security Investigations (HSI) and provided information about life insurance fraud in which he and others had engaged in years earlier.  Prior to volunteering this information, Benderoff was expressly told that he was *not* under arrest.

Benderoff, a savvy informant, volunteered information about this older fraud, which he acknowledges the agents listening to him had no prior information about, to one-up other witnesses he knew the government was contemporaneously

interviewing regarding more recent, but potentially less significant, criminal conduct in which he and others had engaged.

During his time at a private building containing offices of Homeland Security Investigations, Benderoff was never handcuffed, fingerprinted, or booked. The agents with whom he interacted never drew their weapons or threatened Benderoff. Instead, he ate pizza with the agents who were listening to him, walked outside, kept his cell phone, called a friend, and texted an accomplice. He was clearly advised by law enforcement that he did not have to make any statements—advice that his own lawyer reiterated to him in real-time while he was at HSI.

Instead, Benderoff, a law school graduate, eagerly choose to make statements to the agents and did so in an open-doored interview room and kitchenette—a sharp contrast from a prior encounter with law enforcement in which he was actually arrested and invoked his right to remain silent. Another witness who was interviewed by law enforcement at the HSI offices that night remembers seeing Benderoff in an open room, "laughing and having a jovial good time."

While at the HSI offices, Benderoff signed multiple documents making clear that he had not been threatened, coerced, or intimidated. And when he was done talking, Benderoff went home.

After he went home and continued consulting with experienced counsel, Benderoff decided to keep providing information to the government. He did so for

years in multiple extended proffer debriefings, never mentioning the incredible allegations he now makes.

As discussed below, the claims that Benderoff makes now—that he was held in a locked cell for more than nine hours against his will while screaming and crying to get out—are simply not credible.

## I. Background

### a. Las Vegas Trip

On June 23, 2016, Brian Benderoff was returning to Detroit after spending several weeks in Las Vegas. His travel companion was Dr. William Gonte. A second companion on the Las Vegas trip, Robert Gross, had flown back a day earlier.

Benderoff had spent his time in Las Vegas gambling with funds that Gross, an attorney, had obtained from his clients for Benderoff. The problem? Gross had failed to tell his clients their money would be used by Benderoff to gamble. Instead, he made up various stories about what the funds would be used for, such as that the money would be used to pay off equipment liens that would allow for the sale of a business. *See United States v. Robert Gross*, 17-CR-20790, ECF No. 9, PageID. 20-21.

Gross eventually accepted responsibility for his misdeeds and pleaded guilty to having engaged in a wire fraud scheme. He acknowledged making various misrepresentations to secure loans for Benderoff and Gonte—including the loans

7

that Benderoff used in Las Vegas to gamble.  *See Gross*, 17-CR-20790, ECF No. 22, PageID.136 ("Gross pleaded guilty under a Rule 11 agreement, which included a recitation of the factual basis for the conviction. According to that recitation, between 2013 and 2016 Gross engaged in a scheme to procure fraudulent loans for the benefit of two associates named by the government only as 'Person A' and 'Person B.' Those pseudonyms, it appears, were intended to refer to William Gonte and Brian Benderoff.") (citations omitted).   After pleading guilty, Gross was sentenced to 36 months' imprisonment by Judge Lawson.

On June 23, 2016, Benderoff and Gonte were collectively traveling with approximately $1.7 million in cash and $1 million in cashiers' checks.  (Ex. A, Opening Report of Investigation.)   TSA officials in Las Vegas noticed approximately $200,000 to $250,000 in funds in Gonte's carry-on luggage.  (ECF No.110-4, Motion to Suppress, Exhibit D, HSI Tip Line Report, PageID.1894.) When asked about the money, Gonte falsely "advised TSA employees that *he* won the money at a casino."  (*Id*.)  (emphasis added.)  TSA officials notified the HSI Tip Line about the large amount of cash with which Gonte was traveling.  (*Id*.)

### b.  Arrival at Detroit Metropolitan Airport

Before their arrival in Detroit, HSI officials had determined that Gonte and Benderoff were traveling together. (Exhibit B, Johansen Declaration, ¶ 3.)  After arriving in Detroit, Benderoff deplaned before Gonte and was approached by Task Force Officer (TFO) Eric Johansen.

Officer Johansen, a 27-year veteran of the Wayne County Airport Police Authority, was in plain clothes. (*Id*. ¶¶ 1, 6.)  Contrary to Benderoff's claim, Officer Johansen had no weapon displayed.  (*Id*. ¶ 6.)  Nor did he have a badge or handcuffs displayed.  (*Id*.)  Instead, Officer Johansen, who has engaged in hundreds of consensual encounters at the airport, was seeking to blend in at the airport and was carrying a backpack.  (*Id*. ¶¶ 5-6.)  Other plain-clothed officers, with no displayed weapons, were also in the public concourse.  (*Id*. ¶ 7.)

Officer Johansen approached Benderoff, who was holding a cellphone, and identified himself as a law enforcement officer.  (*Id*. ¶¶ 7-8.)  Officer Johansen approached Benderoff by himself while the other plain-clothed officers in the concourse remained a considerable distance away from him and Benderoff.  (*Id*. ¶ 7.)  Officer Johansen *asked* Benderoff if he would be willing to speak with him.  (*Id*. ¶ 9.)  Benderoff verbally indicated that he was willing to speak to law enforcement. (*Id*.)

During this encounter, no weapon was drawn by Officer Johansen. (*Id.* ¶ 10.) Benderoff was not handcuffed or physically restrained. (*Id.* ¶ 11.) No commands were issued. (*Id.* ¶ 9.) And no items were seized from him. (*Id.* ¶ 14.)

After making contact with Officer Johansen, Benderoff asked to use the restroom. (*Id.* ¶ 12.) Contrary to Benderoff's claim, Officer Johansen never refused this request. (*Id.*) Instead, Benderoff freely went to the restroom, still carrying his cell phone and bag. (*Id.* ¶¶ 13-14.)

Law enforcement did not clear out or secure the restroom, which was full of other travelers. (*Id.* ¶ 13.) Another plain-clothed officer entered the restroom while Benderoff was there. (*Id.* ¶ 14.) Benderoff's claim that he saw the "officer's legs about two feet from the stall door" is highly implausible given that Benderoff is over six feet tall and the stall doors in the restroom he used almost reach the ground:



Before officers had asked him a single substantive question, Benderoff already believed he was in trouble.  As he notes in his motion, while in the bathroom, he emailed his lawyer, Thomas Cranmer, declaring: "I'm in trouble."  What he does not note in his motion is that he also reached out to his criminal accomplice Robert Gross, who had fraudulently solicited the money that Benderoff used in Las Vegas to gamble, declaring: "We r in trouble"



In an earlier pleading before this Court, Benderoff falsely suggested that his cell phone was seized by law enforcement as soon as he left the bathroom.  (ECF No. 36, PageID.170.)   As Benderoff now admits, and as is discussed below, Benderoff actually kept—and used—his cellphone the entire time he was interacting with law enforcement on June 23, 2016.

After Benderoff was done emailing his lawyer and accomplice, he left the bathroom and proceeded to the baggage claim area with Officer Johansen, Dr. Gonte, and other plain-clothed officers. (Exhibit B, Johansen Declaration, ¶ 16.) During this time, Benderoff was still carrying his own carry-on bag. (*Id.*) While walking to baggage claim, Dr. Gonte indicated that, contrary to his prior statement to TSA, he had not been gambling and the cash he was carrying had actually been won by Benderoff gambling. (*Id.* ¶ 17.)

At baggage claim, Officer Johansen *asked* both Benderoff and Gonte if they would be willing to travel a few minutes off-site to speak with law enforcement. (*Id.* ¶ 18.) Benderoff and Gonte privately conferred with each other and indicated that they were willing to do so. (*Id.*) While at baggage claim, Benderoff freely used a public restroom again. (*Id.* ¶ 19.)

Benderoff and Gonte were traveling with multiple checked bags, which they identified for law enforcement to retrieve. (*Id.* ¶ 20.)

After his luggage was retrieved, Benderoff freely entered a Ford Expedition SUV. (*Id.*) The vehicle contained no police markings on the outside. (Exhibit C, Williams Declaration, ¶ 3.) And there was no barrier or divider insider the vehicle. (*Id.*) Again, Benderoff was not restrained in any way. (*Id.*)

### c. HSI Offices

Benderoff traveled a few minutes to the offices of HSI, which are in a private office building in Romulus. (*Id*.) Upon arriving there, Benderoff freely exited the vehicle and walked into the office space. (*Id*. ¶ 4.) Shortly thereafter, Benderoff and two plain-clothes officers entered an interview room. (*Id*. ¶ 6.) Later that night, officers interviewed one of Gross's defrauded clients, Dr. Myron Rubin, in that same interview room. (Exhibit B, Johansen Declaration, ¶ 26.) Benderoff told the officers he was claustrophobic and the officers immediately agreed to leave the interview room door open for Benderoff. (Exhibit C, Williams Declaration, ¶ 12.) The door leading to area in which the interview room is in was also propped open. (*Id*.) Officers also ensured that Benderoff was positioned so he could see both open doors and feel more comfortable. (*Id*.) Here is a picture of what that space looks like with both doors open:



Prior to any questioning, Benderoff executed several written waiver and acknowledgement documents. (*Id*. ¶¶ 7-10.)   Benderoff was advised of his rights, including his rights to remain silent and have an attorney present during any questioning, and executed a written waiver making clear that he "fully understood those rights" and was "waiv[ing] them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity":

**STATEMENT OF RIGHTS**

Before we ask you any questions, it is my duty to advise you of your rights:

You have the right to remain silent.

Anything you say can be used against you in a court of law or other proceedings.

You have the right to consult an attorney before making any statement or answering any questions.

You have the right to have an attorney present with you during questioning.

If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.

If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.

**WAIVER**

I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity. I was taken into custody at _____ (time), on _____ (date), and have signed this document at _____ (time), on _____ (date).

Print Name                                    Signature

Witness: _____                  Date: 6/23/1 __

Witness: _____                  Date: 6/23/16

14

(*Id*. ¶ 10; Exhibit D, Statement of Rights.)

The written waiver form also includes spaces that can be completed indicating when an interviewee was taken into custody that are left blank because Benderoff was not in custody. (*Id*. ¶ 8.) **In fact, Special Agent Williams expressly told Benderoff that he was *not* under arrest before the interview began**. (*Id*. ¶ 11.) Later in the interview, when Benderoff asked if he would be able to go home later that day, SA Williams made clear that he would and expressly reminded Benderoff that he was *not* under arrest. (*Id*.)

Prior to being interviewed, Benderoff also executed a written acknowledgment of the requirements of the federal false statements statute (18 U.S.C. § 1001), as well as written document consenting to a search of his carry-on and checked luggage. (*Id*. ¶¶ 9, 10.) The consent-to-search document also notes that Benderoff's consent is given "voluntarily and intentionally" and that it is "freely given and not the result of any promises, threats, coercion, or other intimidation":

I hereby voluntarily and intentionally consent to allow ICE to search my property. My consent is freely given and not the result of any promises, threats, coercion, or other intimidation. **I have read the above statement and understand my rights.**

Name (Please Print) Bryan Willis Benderoff

Signature: X

Date/Time: 6-23-16   1:38 PM

Witnesses:

(Exhibit E, Consent to Search.)

Around the same time, William Gonte was speaking with TFO Eric Johansen and TFO Jeffrey Adamisin in another room.  Gonte was also provided with the same waiver, acknowledgement, and consent documents, which he also executed. (Motion to Suppress, Sealed Exhibit F, Report of Dr. William Gonte Interview, RPT_000346.)

After both Benderoff and Gonte executed consent-to-search documents, a trained canine was deployed on the eight pieces of checked and carry-on luggage with which they had been traveling. The canine gave *positive* narcotics indications for one bag belonging to Benderoff and another bag belonging to Gonte.  (Exhibit F, Report by Task Force Officer Jeffrey Adamisin, RPT_001312.)

### d. Benderoff's Statements

After making clear that he was doing so consensually and voluntarily, Benderoff spent the next several hours making statements to agents.

In between his statements, Benderoff voluntarily stayed at HSI's offices while officers investigated the information he, Gonte, and others were providing to them. Agents remember seeing Benderoff sitting in both a large conference room and cubicle work space while he was not being interviewed.  (*See, e.g.*, Exhibit B, Johansen Declaration, ¶ 22.)   Here are pictures of those spaces:

'





Benderoff asked the agents if he would be able to go home later that evening and the agents repeatedly made clear to him that he would. (Motion to Suppress, Exhibit M, at RPT_000368.)

Notably, Benderoff told agents he never met with any of the individuals from whom Robert Gross obtained gambling funds and that he was unaware of the terms surrounding those financial transactions. (*Id*. at RPT_000368.) But Gonte, who was being interviewed contemporaneously, acknowledged that he did not believe that Gross's clients knew that Benderoff would use their money to gamble and told agents that those clients could have been defrauded. (Exhibit G, Report of William Gonte Interview, at 4.)

Later in the evening, at approximatively 10:15pm, one of Gross's clients, Myron Rubin, arrived at the HSI offices and was interviewed. Dr. Rubin confirmed to law enforcement officers that he was never informed the money he had wired to Benderoff and Gonte's joint bank account would be used for gambling. (Exhibit H, Report of Myron Rubin Interview, at 3.)

Robert Gross also arrived at the HSI offices on June 23, 2016. Gross was interviewed by agents at around 8:15pm. (Motion to Suppress, Exhibit Q, at RPT_000331.) He provided agents with information about his financial dealings with his clients, as well as various other frauds in which Benderoff and Gonte had been involved. (*Id*.) Upon his arrival, Gross saw both Benderoff and Gonte, who,

18

he noted, were in a "large open room," "sitting separately," "not in handcuffs" and "not in a holding cell." (Exhibit I, Report of Robert Gross Interview, at 3.) Benderoff saw Gross walk by and raised his hands in acknowledgment. (*Id.*)

Another witness, Dr. Sheldon Gonte (brother of Dr. William Gonte) also traveled to the HSI offices on June 23, 2016 to be interviewed. Dr. Sheldon Gonte recently told law enforcement that he remembers seeing Benderoff after his arrival and that Benderoff was "laughing, and having a jovial good time" while speaking with law enforcement. (Exhibit J, Report of Sheldon Gonte Interview, at 2.) Dr. Sheldon Gonte stated he never saw Benderoff in a locked prison cell, never heard him screaming or crying, has known Benderoff his whole life, and rather than being distressed in any way, Benderoff appeared, to him, to be acting normally. (*Id.*) He also stated that he does not view Benderoff as an honest person and that Benderoff has a reputation for being dishonest. (*Id.*)

Benderoff kept his cell phone while at the HSI offices. As he notes in his motion, he exchanged text messages in real-time with his lawyer, Thomas Cranmer, who reminded him that he does "not have to make any statements." (ECF No. 110, PageId.1842.) What Benderoff neglects to mention in his motion, is that he also continued to exchange text messages with Robert Gross while at the HSI offices, answering "yes" when Gross asked if he was "getting checks for tomorrow" and

coming to Gross's office the next day; telling Gross he would call him in "an hour;"

and telling Gross that he "will understand later":





Benderoff claims that he "did not have much if any signal" and that his "phone never rang."  (Motion to Suppress, ECF No. 110-1, PageID.1885.)  But his phone records show that he answered short calls from his wife, Amy Mosher, and his mother, Ann Benderoff, while at the HSI offices:





His phone records also show that he called his friend, Lori Selonke:



Benderoff does acknowledge walking outside of the HSI building into the back parking lot in between his statements.  (Motion to Suppress, ECF No. 110, PageID. 1845.)

### e.  Statements at Issue

Benderoff was eager to share information with law enforcement.   After making earlier statements, Benderoff *requested* the opportunity to speak with agents. (Motion to Suppress, Exhibit M, at RPT_000368.).   Resident Agent in Charge Jerome Deaven and Special Agent Brian Helmerson, both of whom are now retired, shared pizza and water with Benderoff and spoke with him in the HSI office kitchenette.  (*Id*.)  Here is a picture of that space:



Benderoff notes that this "final interrogation occurred at about 11:00pm." (ECF No. 110, Motion to Suppress, PageID.1846.)

At this point, after agents had already gained significant information suggesting that the money he had been gambling with had been fraudulently obtained, Benderoff made a strategic calculation to help himself. He volunteered something better—extensive details about the life insurance fraud scheme charged in this case in which he and Dr. William Gonte had engaged years earlier— something that even he acknowledges he was not being questioned about. When he was done sharing information about this scheme, Benderoff agreed to allow agents to search his iPhone, iPad, and email. That written consent to search, signed shortly

before Benderoff departed the HSI offices, again makes clear the consensual nature of Benderoff's interactions with HSI that evening, expressly noting that Benderoff's consent was given "freely" and "not the result of any promises, threats, coercion, or other intimidation":



I hereby voluntarily and intentionally consent to allow ICE to search my property. My consent is freely given and not the result of any promises, threats, coercion, or other intimidation. **I have read the above statement and understand my rights.**

Name (Please Print) _Brian Benderoff_
Signature: X _____
Date/Time: _6/23/16    11:30 p___
Witnesses: _____

(Exhibit K, Consent to Search.)

### f. Benderoff's New Claims

Benderoff now claims that he was held "in a locked prisoner holding cell for more than nine hours." (ECF No. 110, PageID.1811.) He also claims that "[o]n no less than ten occasions, [he] asked to go home and was told that he would not be permitted to leave." (*Id.* at PageID.1839.) And he notes that he was supposedly "screaming to be let out of the cell and crying on and off. . . ." (*Id.* at PageID.1840.)

To be clear: there is no evidence to corroborate Benderoff's claim that he was placed into a locked cell against his will for any period of time—much less the more than nine hours he claims he spent there. Nor is there any evidence to corroborate

Benderoff's claim that he ever asked to leave HSI's offices, was told he could not leave, or was otherwise prevented from leaving.

The government expects to call multiple witnesses at the evidentiary hearing in this matter who will testify that they either personally saw or interacted with Benderoff at the HSI offices on June 23, 2016. These witnesses will expressly contradict Benderoff's claims regarding the events of June 23, 2016, including his claims that he spent hours in a locked cell against his will crying and screaming to get out.

Among these expected witnesses are TFO Johansen and Special Agent Williams. The attached declarations from these witnesses make clear that they never heard Benderoff ask to leave the HSI facilities, they never heard any law enforcement officer tell Benderoff that he could not leave, and they never heard Benderoff screaming or crying. (Exhibits B and C.) The declarations also make clear that Benderoff was not in a locked cell for hours, was not put into such a cell against his will, and that if he was in a cell for any substantial period of time, multiple

witnesses would have seen or heard him.[1]  (*Id.*)  The government expects to call other witnesses at the evidentiary hearing in this matter who will offer similar testimony.

Furthermore, far from exploiting any claustrophobia, the agents' declarations make clear that Benderoff's claims of that condition were accommodated with Benderoff being interviewed in open spaces.  (*Id.*)

### g.  Continued Voluntary Cooperation

After Benderoff went home and consulted with his lawyers, he continued voluntarily providing information to the government over the course of multiple proffer debriefings.

Benderoff's first proffer interview occurred on October 4, 2016 at the U.S. Attorney's Office.  At that interview were some of the same officers with whom Benderoff had interacted a few months earlier—Special Agent Williams, Special Agent Helmerson, and Task Force Officer Johansen.  (Exhibit L, Report of October 4, 2016 Proffer Interview.)   Benderoff was represented by the same lawyer with

---

[1]      At this time, the government has no evidence that Benderoff was in a locked cell for any period of time.  As noted in this brief, multiple witnesses recall seeing Benderoff everywhere but a locked cell on June 23, 2016.  Because no single agent or lay witness was with Benderoff the entire time he was at the HSI offices, the government cannot prove a negative—that Benderoff was never placed in a cell.  But Benderoff's claim is not that he was briefly put into a cell for some insubstantial period of time—it is that he was there for "more than nine hours," against his will, screaming and crying to get out.  And the government can prove that did not happen.

whom he communicated in real-time on June 23, 2016, Thomas Cranmer, and his partner, Gerald Gleeson.  (*Id.*)  At no point during that interview did Benderoff complain about his treatment by HSI.  Instead, he acknowledged to those present that he and Gonte had been "trying for several months to come [sic] with a good story to conceal their activity."  (*Id*. at 7.)

Benderoff provided his second proffer interview on November 2, 2016. Again, Benderoff was represented by Mr. Cranmer and Mr. Gleeson. (Exhibit M, Report of November 2, 2016 Proffer Interview.)  And, again, Benderoff did not share any complaints about his treatment on June 23, 2016.  But he did, again, acknowledge that he and Gonte had "discussed several times to concoct a story to tell agents and people to whom they owed money."  (*Id*. at 9.)  That same day, Benderoff, after consulting with counsel, voluntarily provided consent for his email to be searched, again noting that his consent was "freely given and not the result of any promises, threats, coercion, or other intimidation."  (Exhibit N, Consent to Search.)

Additional proffer interviews with Benderoff and his lawyers were conducted on April 12, 2017; May 1, 2020; and May 16, 2020.  (Exhibits O, P, Q Reports of Interview.)  He continued to voluntarily provide information to the government, and at no point did Benderoff claim that agents had kept him in a locked cell for hours on June 23, 2016 against his will.  (*Id*.)

### h. Brian Benderoff

Brian Benderoff is a law school graduate with a long history of interacting with law enforcement.

Benderoff appears to have begun serving as a cooperating witness with the FBI in 1994, while he still in law school, after running up gambling debts for which he claimed he was being extorted.  (Exhibit R, May 2, 1994 FBI Memo.)   Over the next twenty years, Benderoff voluntarily provided information to the FBI on dozens of distinct occasions, often meeting with agents in person.  (Exhibit S, Benderoff FBI Records.)  He also willingly made consensual in-person recordings on multiple occasions.  (*See, e.g., id.* at 10, 13, 15, 32, 39, 40, 76, 98, 102.)

 Benderoff was terminated by the FBI as a confidential source in 2005, after the FBI determined him to be "unreliable" and indicated that he "[s]hould not be considered for future use by the FBI":

**Details:** Captioned individual is being closed for the following reason: (check one)

| | |
|---|---|
| Confidentiality Revealed ___ | Converted to CI/Asset ___ |
| Cooperation Completed ___ | Criminal Activity/ |
| Criminal Activity/Violent+ ___ | Non-Violent+ ___ |
| Denied by FBIHQ ___ | Died ___ |
| Disbarred ___ | Entered WSP ___ |
| Incarcerated ___ | Poor Health ___ |
| Requested Termination ___ | Transfer of Agent ___ |
| Relocated/Unavailable ___ | Unproductive ___ |
| Unreliable _X_ | Violated Instructions ___ |

 C 1 9 2005

a. Was the captioned individual's relationship with the FBI ever disclosed outside of the Department of Justice? _X_ No ___ Yes  If yes, is documentation in the CW's file indicating to whom disclosure was made and why? (indicate serial #)

b. Should captioned individual be considered for future use by the FBI? ___ Should _X_ Should Not  This decision is based on captioned individual's current gambling addiction making his/her behavior unpredictable.

(Exhibit T, FBI Termination Record.)

On August 10, 2006, Benderoff was arrested by the FBI and Southfield Police pursuant to a warrant from New Jersey. During that encounter, Benderoff, after resisting arrest, appears to have invoked his right to counsel, and was not interviewed by law enforcement:

**Details:** On 8/10/2006, pursuant to a state arrest warrant issued in the state of New Jersey, Brian Willis Benderoff, DOB ▉▉▉ was located and arrested at his residence, ▉▉▉ Southfield, MI.  Benderoff resisted Southfield PD officers during the arrest, forcing officers to use a taser to subdue him.  Benderoff was transported to Southfield PD and charged with Resisting and Obstruction (R&O).  Benderoff invoked his right to an attorney and was therefore not interviewed.

(Exhibit U, FBI Report re August 10, 2016 Arrest of Benderoff.)

Two years later, the government was forced to dismiss a case in which Benderoff had claimed to be a victim of extortion, noting that "questions about the victim's credibility have raised serious issues about success at trial":

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,            CRIM. NO. 00-80228

v.                           HON. DENISE PAGE HOOD

D-1   STEVEN KIZY,

                Defendant.
_____/

MOTION AND BRIEF TO DISMISS
INDICTMENT AND ARREST WARRANTS

THE UNITED STATES OF AMERICA moves this Court for leave to dismiss the Indictment against Steven Kizy in the above-entitled case for the following reasons:

Questions about the victim's credibility have raised serious issues about success at trial. The Federal Bureau of Investigation has requested the dismissal of this case.

s/Keith E. Corbett              s/With Consent of Stephen J. Murphy
Assistant United States Attorney   United States Attorney
211 W. Fort Street           211 W. Fort Street
Suite 2001                 Suite 2001
Detroit, MI 48226         Detroit, MI 48226
Phone: (313) 226-9640      Phone: (313) 226-9501
Email: keith.corbett@usdoj.gov   Email: stephen.j.murphy@usdoj.gov
Bar No. P24602             Bar No. P58137

Dated: April 11, 2008

31

By his own admission, Brian Benderoff has engaged in repeated crimes of dishonesty, including the charged fraud in this case—a scheme to sell life insurance policies utilizing falsified medical records.  And in 2010, while engaged in the crimes at issue in this case, Benderoff pleaded guilty in New Jersey to engaging in another financial crime relating to gambling.  In that case, Benderoff acknowledged he used travelers checks to gamble despite knowing that the travelers checks had not been paid for.

---

DEFENDANT'S VERSION (COMPLETE ONLY UPON APPLICATION FOR PTI AND AFTER CONVICTION)

"I received travelers checks from Michael Edwards, who owned Shreve Lazar located in Caesars Casino.  I received travelers checks and gambled with them.  I took the checks knowing that he hadn't paid American Express for them nor did I."

s/01/19/2010/Brian Benderoff

---

(Exhibit V, Benderoff New Jersey Presentence Report, at 2.)

## II.    The Law

### a. Seizure and the Fourth Amendment

The Supreme Court has made clear that "[t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry. . . ." *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497 (1980).   "[C]haracterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." *Id*. at 554.   "[N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required." *Fla. v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382, 2388, 115 L. Ed. 2d 389 (1991)

Rather, "[a] person is seized by the police and thus entitled to challenge the government action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254, 127 S. Ct. 2400, 2405, 168 L. Ed. 2d 132 (2007) (internal citations and quotations omitted).  The test for whether a "seizure" has occurred is an objective one and depends on whether a "a reasonable person would have believed that he was not free to leave" and "whether a reasonable

person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id*. (citations omitted).   Whether a reasonable person would feel free to leave is also a factor in determining whether, under an examination of the totality of circumstances, an individual is "in custody" for purposes of the Fifth Amendment. *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003).  For the determination of whether an individual is in custody, "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id*.  (citations omitted).

Among the factors considered by a court in determining whether a seizure has occurred are the following: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.  (citations omitted).

As Benderoff acknowledges, "[t]he Fourth Amendment does not apply to consensual encounters with government agents where the individual gives valid consent . . . a person can consent to speaking with law enforcement or agree to accompany them to another location for an interview."  (ECF No. 110, PageID. 1851-52.)   And a consensual encounter does not require an officer to expressly indicate that someone is free to leave.  *See Mendenhall*, 446 U.S. at 555 ("Our conclusion that no seizure occurred is not affected by the fact that the respondent

was not expressly told by the agents that she was free to decline to cooperate with their inquiry, for the voluntariness of her responses does not depend upon her having been so informed.").  Nor does a seizure occur simply because an individual acts against his or her self-interest or later regrets the consensual encounter.  *See id*. at 555–56. ("We also reject the argument that the only inference to be drawn from the fact that the respondent acted in a manner so contrary to her self-interest is that she was compelled to answer the agents' questions. It may happen that a person makes statements to law enforcement officials that he later regrets, but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily.").

When a seizure does occur, it should be supported by probable cause if the seizure goes beyond a limited investigatory stop.  *Fla. v. Royer*, 460 U.S. 491, 501, 103 S. Ct. 1319, 1326, 75 L. Ed. 2d 229 (1983).  "Probable cause 'is not a high bar.' *D.C. v. Wesby*, 138 S. Ct. 577, 586, 199 L. Ed. 2d 453 (2018) (citations omitted). "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *Id*. at 586.  (citations omitted).

### b.  The Exclusionary Rule

Even if a defendant is improperly seized without probable cause, evidence stemming from that seizure is not categorically inadmissible.  The applicable analysis is *not*, whether the evidence "would not have come to light but for the illegal

actions of the police." *Brown v. Illinois*, 422 U.S. 590, 599, 95 S. Ct. 2254, 2259, 45 L. Ed. 2d 416 (1975). Instead, the relevant question is whether the "evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 599 (citations omitted).

The Supreme Court has expressly recognized the possibility "that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality." *Id.* at 603. "The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest." *Id.* Other factors identified by the Court as important to a determination of whether an illegal arrest has been exploited are the "temporal proximity of the illegal arrest and confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct. . . ." *Id.* (citations omitted). Furthermore, as discussed below, "[t]he voluntariness of the statement is a threshold requirement." *Id.*

### c. Voluntariness and The Fifth Amendment

A defendant's custodial statements are not admissible unless the statements are voluntarily made and the defendant has first been informed of his or her *Miranda* rights and has waived those rights "voluntarily, knowingly, and intelligently." *Colorado v. Spring*, 479 U.S. 564, 566, 107 S. Ct. 851, 853, 93 L. Ed. 2d 954 (1987).

"The test for whether a *Miranda* waiver is voluntary is essentially the same as the test for whether a confession is voluntary." *United States v. Redditt*, 87 F. App'x 440, 445 (6th Cir. 2003) (citations mitted). And that voluntariness determination requires an evaluation of the totality of the circumstances. *United States v. McConer*, No. 05-80213, 2005 WL 8164123, at *2 (E.D. Mich. July 1, 2005) (Edmunds, J.) (citing *Leadbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994); *Fikes v. Alabama*, 352 U.S. 191, 197 (1957)). "Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Ledbetter*, 35 F.3d at 1067 (citations omitted). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary. . . . '" *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 522, 93 L. Ed. 2d 473 (1986) (citations omitted). "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989) (citations omitted).

## III.   Argument

### a.  Benderoff Was Never Seized by Law Enforcement

#### i.  Benderoff Was Not Seized at the Airport

Benderoff's interaction with law enforcement at the airport has the exact markings of the type of consensual encounter the Supreme Court found *not* to be a "seizure" in *United States v. Mendenhall*:

| *Mendenhall* | **Benderoff** |
|---|---|
| "The events took place in the public concourse."<br>*Mendenhall*, 446 U.S. at 555. | Same |
| "The agents wore no uniforms." *Id.* | Same |
| Agents "displayed no weapons." *Id.* | Same |
| "They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents." *Id.* | Same (with only a single officer approaching Benderoff) |
| "They requested, but did not demand to see the respondent's identification and ticket." *Id* | Same (with no request to see Benderoff's ticket) |
| "Respondent was not told that she had to go to the office, but was simply asked if she would accompany the officers." *Id*. | Same |

In *Mendenhall*, the Supreme Court had no hesitation in finding that such an encounter was not a seizure and expressly noted that this conclusion "is not affected by the fact that the respondent was not expressly told by the agents that she was free to decline to cooperate with their inquiry." 446 U.S. at 555.

Here, the facts showing that Benderoff was not seized are even stronger than those in *Mendenhall*.  In addition to all the consensual markings noted above, a reasonable person would not believe he was seized if he could freely take his cell phone into a public bathroom—where he could dispose of evidence or communicate with accomplices—immediately after a purported seizure.  And no reasonable person would believe he was seized if he was permitted to confer with an accomplice before deciding whether to travel to law enforcement offices to answer questions.

Benderoff largely ignores the on-point decision in *Mendenhall* and instead focuses his attention on cases with easily distinguishable facts—most of which are out-of-circuit decisions concerning the question of whether a defendant voluntarily consented to a search.  But this is not a case like *United States v. Bowman*, in which an officer "directed" a defendant to remain in a patrol car while the officer exited the vehicle to question somebody else.  884 F.3d 200, 213 (4th Cir. 2018).  Nor is this case anything like *United States v. Weidul*, in which officers entered a "home without permission" and "told," rather than asked, the homeowner that they were going to search a room in the house.  325 F.3d 50, 54 (1st Cir. 2003).  *United States v. Ruiz-Estrella*, a case that predates the Supreme Court's decision in *Mendenhall*, addressed the question of whether a defendant voluntarily consented to a search of his bag when he "silently" handed it over to a uniformed officer who had taken the defendant "into a stairwell . . . and closed the door . . . ."  481 F.2d 723, 724 (2d Cir.

1973).   And in *United States v. Beauchamp*, the Sixth Circuit found that the defendant "would not have felt free to leave when, after walking away from the police two times, an officer targeted Beauchamp by driving up to him, instructed him to stop, and then instructed him to turn around and walk toward the officer." 659 F.3d 560, 566 (6th Cir. 2011).

### ii. Benderoff Was Not Seized or Placed into Custody at the HSI Offices

The government disputes Benderoff's claims about what happened at the HSI offices after Benderoff arrived there.  To be clear: If Benderoff's version of events is believed, there is no question that he was seized and in custody.  But, as discussed in this brief and as will be further established at the evidentiary hearing in this matter, Benderoff's claims are entirely uncorroborated and simply not credible.  Instead, the facts make clear that Benderoff was neither seized nor in custody at the offices at HSI.

There is no evidence—in any report or elsewhere—to support Benderoff's claim that he spent either nine or ten hours in a locked prison cell against his will. Instead, the government expects to introduce testimony from multiple witnesses who will indicate that they saw Benderoff everywhere but a locked cell during his time at the HSI offices—including in a conference room, office cubicle, interview rooms, office kitchenette, and even outside.

There is no evidence—in any report or elsewhere—to support Benderoff's claim that he was screaming to be let out of a locked cell or crying in despair. Instead, the government expects to introduce evidence from multiple witnesses who will indicate that they would have been in a position to either hear or see such cries and that there were none.   And witnesses will testify that when they did see Benderoff, his demeanor did not evidence any signs of distress.

There is no evidence—in any report or elsewhere— that Benderoff ever asked any agent to leave or that any officer denied such a request.  Instead, the government expects to introduce evidence from multiple witnesses who personally interacted with Benderoff that will make clear that no such requests were ever made or denied. And, importantly, **at least one agent expressly told Benderoff that he was not under arrest**.  As the Sixth Circuit has made clear, and this Court has previously recognized, "in determining whether a defendant is in custody, advising the defendant that he is not under arrest is arguably the most significant factor." *United States v. Gleaton*, No. 09-20136, 2009 WL 1689660, at *3 (E.D. Mich. June 16, 2009) (citing *United States v. Salvo*, 133 F.3d 943, 951).

The government also expects to introduce evidence making clear that Benderoff was never handcuffed, fingerprinted, or photographed as part of any sort of booking process.  Instead, Benderoff kept and used his cell phone—something a reasonable person would understand does not happen when somebody is seized or

taken into custody.  *Cf. United States v. Ambrose*, 668 F.3d 943, 960 (7th Cir. 2012)

("Ambrose called his wife twice in regard to that conference, and also called Hansen

during an interview to ask him a question. That further indicates a level of freedom

inconsistent with a custodial situation."); *United States v. LeBrun*, 363 F.3d 715, 722

(8th Cir. 2004) ("While the mere possession of a cellular phone without more will

not transform a custodial interrogation into a noncustodial one, it is relevant to the

question of whether the interview was coercive and whether a reasonable person in

the same circumstances would feel restrained.") (citations omitted).  Benderoff also

freely ate pizza with the agents in an office kitchenette—something that a reasonable

person would understand does not happen during a seizure or custodial interaction.

Recognizing that there is no evidence to corroborate his claims, Benderoff

focuses his attention elsewhere.  Notably, Benderoff highlights a cherry-picked text

message sent to his lawyer in which he claimed to be "detained."[2]  But Benderoff's

subjective understanding of his encounter with law enforcement is irrelevant as the

---

[2]    So as to be able to fully and fairly respond to Benderoff's reliance on this text
message exchange as purported evidence of what happened on June 23, 2016, the
government has moved the Court for (1) a finding that Benderoff has waived the
attorney-client privilege with Miller Canfield as to communications relating to the
events of that day and (2) an order requiring the production of relevant information
regarding that subject matter.  (ECF No. 119.)  As explained in the government's
motion, because of Benderoff's waiver, the Court and government are entitled to
know whether other communications with Benderoff's lawyers at Miller Canfield
are consistent with the story Benderoff is now telling the Court.  The government's
motion is pending before this Court.

dispositive question is "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628, 111 S. Ct. 1547, 1551, 113 L. Ed. 2d 690 (1991).

Benderoff also highlights a portion of an agent report that notes that "[o]n several occasions Benderoff stated he would provide the agents with truthful statements if he was allowed to return home that evening. Agents agreed to his request."   (ECF No. 110, Motion to Suppress, PageID.1845.)   Benderoff characterizes this note as indisputable proof that he was either seized or in custody. But it is hardly that.  In making his argument, Benderoff performs an impressive rhetorical feat: whatever answer that would have been provided by law enforcement to Benderoff's question would now be proof of his seizure and custodial status. Certainly, if agents had not agreed to Benderoff's request to go home later that evening, that would be evidence that he was seized or in custody.  But when agents repeatedly agreed that he could go home?  According to Benderoff, that, too, must be evidence of his seizure and custody.

But a reasonable person would not believe he is seized or in custody when it is made clear to him that he'll be able to go home at the time about which he has inquired. *Cf. Ambrose*, 668 F.3d at 959–60 ("Ambrose asked how long the interview would take because he needed to attend a parent-teacher conference that night. The

agents responded that they were not sure how long it would take to go through the questioning. Ambrose's statement is evidence that the atmosphere was not intimidating, and the agent's response is relevant to determining whether a reasonable person would feel free to leave. The agent did not dismiss his concern by stating that he was not going home, but rather considered the length of time that the questioning might take. That would further lead a reasonable person to think that he was free to leave."); *United States v. Patterson*, 826 F.3d 450, 458 (7th Cir. 2016) ("Finally, Patterson left after the interrogation, which weighs against a custody finding. Also weighing against custody is the fact that Patterson and the agents had a conversation about the issuance of the warrant for Patterson's arrest and how much time Patterson had to get his affairs in order. Patterson even made arrangements with the agents to turn himself in once an arrest warrant issued.").

### b. The Exclusionary Rule is Not Triggered Even if There Was an Improper Seizure

Even if Benderoff was improperly seized or placed into custody (he was not), his statements to law enforcement are still admissible.

Benderoff does not challenge the fact that he was provided *Miranda* warnings and expressly indicated, in writing, that he understood his rights and was expressly waiving those rights in deciding to speak with law enforcement. As the Supreme Court has noted, the provision of such warnings is an "important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal

arrest." *Brown*, 422 U.S. at 603.  Such warnings can be provided prophylactically as part of witness interviews without affecting a determination of whether the witness was in custody or seized. *See United States v. Lewis*, 556 F.2d 446, 449 (6th Cir. 1977) ("The precaution of giving *Miranda* rights in what is thought could be a non-custodial interview should not be deterred by interpreting the giving of such rights as a restraint on the suspect, converting a non-custodial interview into a custodial interrogation for *Miranda* purposes."); *United States v. Wolfe*, 166 F. App'x 228, 233 (6th Cir. 2006) ("[T]he mere reading of *Miranda* warnings does not convert a noncustodial interview into a custodial interrogation.") (citations omitted).

Furthermore, here there are both intervening circumstances and significant evidence showing that law enforcement officers did not engage in purposeful and flagrant misconduct.  Notably, even though Mr. Benderoff was never seized or taken into custody, agents quickly developed probable cause—apart from any statements made by Benderoff—that would have justified such action if taken.  The development of this probable cause shows that the agents were acting in good faith rather than engaging in some sort of purposeful and flagrant misconduct like that in *Brown*, in which officers engaged in "obvious[ly]" improper conduct by breaking into the defendant's apartment and arresting him without probable cause simply hoping "that something might turn up.'" *Brown*, 422 U.S. at 605.

Shortly after Benderoff consented to a search of his luggage at 1:38pm after arriving at the HSI offices, a trained narcotics dog alerted on one of his pieces of luggage.   The Sixth Circuit has held that such an indication, alone, establishes probable cause to support an arrest. *See United States v. Alvarado,* 936 F.2d 573, 1991 WL 119265, at *2 (6th Cir. 1991) (unpublished table decision) ("Thus, probable cause to arrest defendant existed from the moment he took possession of the luggage on which Lieutenant Bibbs' trained narcotics dog had previously alerted.").

And the probable cause only increased.   In his first interview with law enforcement, William Gonte indicated that Robert Gross had solicited loans of "close to 2 millions dollars" before he and Benderoff went to Las Vegas.  (Motion to Suppress, Sealed Exhibit F, Report of Dr. William Gonte Interview, RPT_000347.)  However, when Gonte was "asked if the investors were aware that Benderoff would be gambling with their money, Gonte would not answer."   (*Id*.)  Later, in a second interview, which concluded at 9:12pm—well before Benderoff made the statement that he seeks to suppress—Gonte acknowledged he "did not believe that Gross's clients knew that their money would be used for gambling" and said that they "could have been defrauded."   (Exhibit G at 4.)  And in another interview that took place before Benderoff's challenged 11:00pm statement, one of Gross's clients, Dr. Myron Rubin indicated that he had wired $200,000 to a joint

account belonging to Dr. Gonte and Mr. Benderoff after taking out a home equity loan. (Exhibit H.)  Dr. Rubin confirmed that he had never been told "that his money would be used for gambling." (*Id*. at 3.)  These witness statements provided more than sufficient probable cause to conclude that Robert Gross's clients had been defrauded when they provided the funds that Benderoff used to gamble.

Regardless of whether Benderoff was a participant or co-conspirator in that fraud scheme, there was no question that he engaged in monetary transactions with the proceeds of that fraud scheme by using the solicited money to gamble.  And 18 U.S.C. § 1957(a) plainly prohibits anyone from "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000" when those funds are "derived from specified unlawful activity."   Wire fraud is a "specified unlawful activity."  *See* 18 U.S.C. §§ 1956(C)(7)(A); 1961(1); 1957(f)(3).

The agents were not required to credit Benderoff's implausible claim that he had no idea what representations were made that resulted in him ending up with millions of dollars with which to gamble.  *See Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) ("A policeman, however, is under no obligation to give any credence to a suspect's story. . . .").  And even if Benderoff did not actually know that any of Gross's clients had been defrauded into giving him money with which to gamble, but "deliberately closed his eyes to what was obvious" and was "aware of a

high probability" that they had been defrauded, that, too, would be enough for him to have engaged in money laundering in violation of 18 U.S.C. § 1957. Sixth Circuit Pattern Jury Instruction 2.09. This is especially true at the probable cause stage, which, again, "is not a high bar" and requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity."' *D.C. v. Wesby*, 138 S. Ct. 577, 586, 199 L. Ed. 2d 453 (2018).

Other facts—in addition to the emergence of probable cause before the challenged statements—also show that there was no flagrant or purposeful misconduct in this case. Benderoff was one of at least five individuals who voluntarily traveled to the HSI offices on June 23, 2016 to be interviewed. He voluntarily remained there while law enforcement officers ran down changing, convoluted, and implausible stories about how he and Dr. Gonte came to be traveling with $2.7 million in luggage on which a trained narcotics canine had indicated. Benderoff was expressly told he was not under arrest. And agents accommodated Benderoff's purported claustrophobia by interviewing him with doors open; provided him with pizza; did not prevent him from walking outside; did not seize his cell phone or prevent him from using it; and generally treated him no different than Robert Gross and the two victims—Myron Rubin and Sheldon Gonte—whom they also interviewed at their offices that night.

As discussed above, Benderoff's claims that "agents leveraged Mr. Benderoff's mental anguish to extract his incriminating statements" or left him in a locked cell against his will for nine or ten hours are simply not credible. Instead, Benderoff, an experienced former government cooperator and law school graduate, made the strategic calculation that he needed, again, to sell his utility as a cooperator to the government by eagerly providing agents with information. That fact that he now regrets that decision does not mean the government engaged in any flagrant or purposeful misconduct. *Cf. Mendenhall*, 446 U.S. at 555–56.

Notably, this case is nothing like *Dunaway v. New York*, upon which Benderoff relies in his brief. In that case, officers were instructed to "pick up" the defendant in a murder investigation and "bring him in" based on an uncorroborated jailhouse tip and the defendant "would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody." 442 U.S. 200, 212, 99 S. Ct. 2248, 2256, 60 L. Ed. 2d 824 (1979). Nor is this case like *United State v Shaw,* 464 F.3d 615 (6th Cir. 2006), upon which Benderoff also relies. In that case, officers handcuffed the defendant at his home, "did not permit [him] to go inside and put shoes on before leaving," and drove him to an Army police station without ever asking him for his consent. *Id*. at 619. And Benderoff's reliance on *United States v. Watson*, 489 F. App'x 922, 929 (6th Cir. 2012), is misplaced. In that case, officers entered a home without a warrant, arrested the defendant without

probable cause, and eventually questioned him about a firearm and drugs that were found in the home pursuant to a later-executed search warrant. *Id.* Furthermore, in all those cases, officers were found to have exploited an illegal arrest to obtain a statement regarding a subject matter the officers were investigating and interrogating a defendant about—not an unrelated matter about which a defendant volunteered information.

### c. Benderoff's Statements Were Made Voluntarily

As this Court has recognized, "giving the [Miranda] warnings and getting a waiver has generally produced a virtual ticket of admissibility." *McConer*, No. 05-80213, 2005 WL 8164123, at *2 (citing *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S. Ct. 2601, 2608 (2004); *see also Loza v. Mitchell*, 766 F.3d 466, 478 (6th Cir. 2014) ("If a defendant has been advised of his *Miranda* rights and voluntarily waived them, it will be difficult to claim that his confession was nonetheless involuntary.") (citations omitted). "[M]aintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina. . . ." *Missouri v. Seibert*, 542 U.S. at 609.

Prior to making the statements he challenges, Benderoff was advised of his *Miranda* rights and executed a document that expressly noted his voluntary waiver of those rights. Specifically, Benderoff's waiver made clear that he "fully understood those rights" and was "waiv[ing] them freely and voluntarily, without

threat or intimidation and without any promise of reward or immunity."  Prior to making any substantive statements, Benderoff also executed a document reflecting his consent to search his luggage.  That document also made clear that Benderoff's consent was given "voluntarily and intentionally" and was "freely given and not the result of any promises, threats, coercion, or other intimidation."  And shortly after making the statements he challenges, Benderoff executed another consent-to-search document that also made clear that his consent was given "voluntarily and intentionally" and was "freely given and not the result of any promises, threats, coercion, or other intimidation."  However, despite repeatedly and expressly indicating that his actions were being made "voluntarily and intentionally" and were not the result of "coercion," Benderoff now claims the exact opposite.

But in this case, as discussed above, there was neither coercion nor an involuntary statement by Benderoff.  There is absolutely no evidence to corroborate Benderoff's recent claim that he was held in a locked cell for over nine hours against his will.  But there is undisputed evidence of the following:

- Benderoff is a middle-aged law school graduate with a long history of interacting with law enforcement.

- Benderoff has voluntarily provided information to law enforcement on countless occasions and has also, apparently, previously invoked his right to remain silent when he thought that was in his interest.

- On the night in question, Benderoff was never handcuffed, fingerprinted, or booked.

- Benderoff freely walked outside, ate pizza, and kept (and used) his cell phone while at the HSI offices.

- Agents never drew their weapons or threatened Benderoff.

- Far from exploiting his purported claustrophobia, agents accommodated Benderoff by interviewing him in open rooms.

- Witnesses—including non-law enforcement witnesses—remember seeing Benderoff everywhere but a locked cell, including in a conference room, office cubicle, interview room, and kitchenette.

- When Benderoff was done talking, he went home.

- Benderoff decided to continue voluntarily providing information to the government after making his challenged statements.  He did so for years in multiple extended proffer debriefings, never mentioning his recent claim that he had supposedly been held against his will for over nine hours in a locked prison cell.

Furthermore, as Benderoff acknowledges, the statement he now challenges was "precipitated by a request from Mr. Benderoff to talk to Agent Helmerson." (ECF No. 110, PageID.1846.)   Importantly, the Supreme Court has made clear that "volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694 (1966); *see also United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) ("None of Cole's other admissions was suppressed, however, because they were not made in response to interrogation.").  Benderoff does not, and cannot claim, he was somehow being interrogated about a scheme he admits "was heretofore unknown to law enforcement" before he sought to tell them about it. (ECF No. 110, PageID.1847.)

## IV.   Conclusion

Benderoff is a professional gambler.  On June 23, 2016, Benderoff decided to gamble by voluntarily providing information to federal investigators.  He doubled down on that bet by continuing to cooperate with the government's investigation for years.  But the payout for Benderoff's bet—the government's plea offer—was apparently not lucrative enough.

Now Benderoff makes a new wager—that he can sell the Court on an entirely uncorroborated and incredible story that he was held against his will in a locked prison cell for over nine hours.  But the outcome of Benderoff's wager does not depend on the luck of the draw, but rather the facts and law.  And neither support providing Benderoff with the payout for which he hopes.  His motion should be denied.

Respectfully submitted,

DAWN N. ISON
United States Attorney

s/Andrew Yahkind
s/Mark Chasteen
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9565
E-Mail: andrew.yahkind@usdoj.gov
E-Mail: mark.chasteen@usdoj.gov

Dated:  July 19, 2022

**Certificate of Service**

I certify that on July 19, 2022, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

s/Andrew Yahkind
Andrew Yahkind
Assistant U.S. Attorney
United States Attorney's Office
